## CENTRAL STATES ELECTRIC CO. *v.* CITY OF MUSCATINE ET AL.

No. 85.   Argued December 8, 1944.—Decided February 12, 1945.

*Mr. Perry M. Chadwick,* with whom *Mr. Bert L. Klooster* was on the brief, for petitioner.

*Mr. Charles V. Shannon,* with whom *Solicitor General Fahy, Assistant Attorney General Shea, Messrs. Robert*

*L. Stern, Jerome H. Simonds* and *Stanley M. Morley* were on the brief, for the Federal Power Commission; and the cause was submitted by *Mr. Matthew Westrate* for the City of Muscatine and by *Elmer E. Johnson, pro se,*— respondents.

Mr. Justice Roberts delivered the opinion of the Court.

We are concerned in this case with the nature and extent of the powers of a federal court sitting to review an order of the Federal Power Commission.

The decision of the court below denied the petitioner's application for payment to it of a fund of some $25,000 deposited in court, and directed its payment to persons not privies to the transaction which created the fund. A detailed recitation of events is required to show how the question arises.

The Federal Power Commission (hereinafter called Commission), proceeding under the Natural Gas Act,[1] entered an order against the Natural Gas Pipeline Company of America (hereinafter called Pipeline) requiring it to cut its rates on natural gas to effect an annual reduction in revenue of not less than $3,750,000, effective September 1, 1940.

The petitioner, Central States Electric Company (hereinafter sometimes called Central), an Iowa corporation doing a public utility business in that State and elsewhere, purchased gas at wholesale from Pipeline and distributed it in Iowa.

Pipeline sought a review of the Commission's action by the Circuit Court of Appeals. The court set aside the order but, on certiorari, we reversed and sustained it.[2] At the inception of the case Pipeline had petitioned for a

---

[1] 52 Stat. 821; 15 U. S. C. § 717.

[2] *Federal Power Commission* v. *Natural Gas Pipeline Co.*, 315 U. S. 575.

temporary stay and the court below had granted a stay on condition that a bond be filed to secure the refund to purchasers at wholesale of the amounts respectively due them if the court should sustain the reduction of rates ordered by the Commission. On the dissolution of the temporary stay another was entered to continue until the further order of the court, conditioned that Pipeline should enter a second bond in the same terms. This was done.

When this court rendered its judgment sustaining the rate order, Pipeline became liable to make refunds in accordance with the bond. The court below, prior to the payment of the amount due under the bond, filed an opinion holding that it was its duty to take exclusive control over the refund when made and to determine the rights of all claimants in the fund, and made an order enjoining claimants to the fund from further proceeding in any other court. This action was pursuant to a petition of Pipeline showing that suits were being filed against it in other courts by the ultimate consumers of the gas sold by Pipeline to the local distributing companies and alleging that unless the court retained jurisdiction of the fund Pipeline would be subjected to numerous similar suits. Illinois Commerce Commission, in an answer, stated that the rates charged by distributing companies in Illinois were fixed by it and reflected the prices paid by distributors to Pipeline and that the refund, representing excessive rates paid by distributors, had been collected from the ultimate consumers and was equitably due them. The Illinois local distributors then before the court agreed that the refund should be ratably paid to the ultimate consumers.

Central was not a party to the proceeding in the Circuit Court of Appeals, but, on June 29, 1942, it sent a letter to the Clerk, in response to one from him, asserting that the portion of the refund representing excessive rates paid by Central during the refund period should be repaid to

it and not to the ultimate consumers. June 30, 1942, the court rendered an opinion in which it discussed the relative rights and interests of local distributors and ultimate consumers. The court found that, since the rates charged to local consumers included the excess charges paid by distributors to Pipeline, the ultimate consumers were in equity entitled to receive the refund. July 1, 1942, Pipeline paid into court a sum representing that portion of the rates paid to it in excess of the rate permitted by the Commission's order. The court thereupon entered an order to show cause, which specified the refund period, determined that the amount paid into court was the property of the ultimate consumers, and allocated the fund to the customers of the local distributors, including Central's customers (to whom there was allocated $25,708.54), reserved jurisdiction of the fund for the protection of all persons having rights therein, and directed all claimants to the fund to show cause why the order should not be binding on them. Later the court entered an order in which it found that Central had raised an issue concerning the relative rights of itself and its customers to the amount in question. Central, which, as we have said, had not become a party to the proceedings, then filed a petition in intervention praying that the sum be paid to it, and leave to intervene was granted. Central's petition set forth that it purchased natural gas from Pipeline during the refund period, pursuant to a contract; that the sum in question represented amounts paid by Central during the refund period in excess of the rates fixed by the Commission's order; that Central sold more than 81% of the gas in question without profit to Iowa Electric Company, which resold the same to some 2,400 consumers in Muscatine, Iowa, and that Central sold the balance directly to some 320 consumers in Greenfield, Iowa, 597 in Knoxville, Iowa, and 366 in Pella, Iowa; that less than 12½% of the gas sold in Knoxville and Pella was natural

gas; that Iowa Electric Company had transferred all its rights in and to the fund to Central for the purpose of these proceedings; that, by the law of Iowa, the power to fix rates for gas service is vested in its municipalities, and the utility rates in that State are not regulated by any State agency or commission; that rates to consumers had been voluntarily reduced to meet competitive conditions and that such rates had been approved by resolution of the Council of Muscatine; and that, due to conditions in the communities serviced, the rates charged consumers were insufficient to produce a fair return.

Thereafter the court entered an order directing that the Attorney General of Iowa and the purchasers of gas from Central, and their respective municipal representatives in Muscatine and Greenfield, be notified of Central's claim to the fund and that they show cause why the relief sought by Central should not be granted. No such order was made with respect to consumers in Knoxville and Pella nor to any officials of those cities. The City of Muscatine and the Mayor of Greenfield, purporting to represent the consumers in those cities, filed separate pleadings in which they asserted that the fund in question belonged to the consumers.

The court, without hearing evidence, denied the relief prayed by Central by an order which was stated to be "without prejudice" to Central's "making claim of adjustment with the cities of Muscatine, Greenfield, Knoxville and Pella . . . or with the consumers of gas furnished by it in said cities." The reason stated for making the order was that the court was without jurisdiction to hear Central's claim since it involved a determination of "the reasonableness of petitioner's rates" and further since the court had previously ruled that the refund belonged to the ultimate consumers. In a separate order entered the same day, the court directed payment of the sum in question to the treasurers of the several cities in specified

amounts. It fixed the amount allocated to Muscatine at 81% of the fund, apparently relying upon the allegation of the petition that more than 81% of the gas purchased from Pipeline was delivered to consumers in that city. It apparently failed to give consideration to the allegation that less than 12½% of the gas sold in Knoxville and Pella was natural gas. The order recited that the fund belonged to the ultimate consumers and that the court desired to pay it at the earliest possible time to "such parties as are entitled to the same, and to permit of a determination of said rights by a court or body having jurisdiction thereof." Thereafter Central filed a supplemental petition setting forth that, except for the stay order, Central would have retained the sum in question; that Central was the only party in privity with Pipeline and was, therefore, entitled to the benefit of the rate reduction, and that the bond filed pursuant to the court's order called for payment of the refund to purchasers at wholesale, one of whom was Central. It further attacked the jurisdiction of the court to award the sum to Central's ultimate consumers since such an award amounted to a retroactive reduction of local rates to which the Natural Gas Act, by express terms, did not apply, and, finally, asserted that the court ought not to make the award based on a conclusion of fact unsupported by any evidence that the burden of the excessive rates had been passed on to the consumers whereas the court, at the same time, disclaimed jurisdiction to determine the reasonableness of local rates and, therefore, refused to hear evidence of Central's equitable right to the fund. Muscatine and the Mayor of Greenfield responded. The court denied the petition without hearing or argument.

The court below was right in its view that as a federal court it had no power, at least in the absence of federal legislation purporting to confer such power upon it, to fix or adjust Central's rates, that being a legislative function

of the State of Iowa. This would be so where the fund in dispute came into its possession in a proceeding to enjoin the operation of an order affecting state rates,[3] and must be equally true where the proceeding was one to enjoin collection of a rate for interstate service. This, because the court below had no power as a court of equity to fix rates, and as a federal court had no power to adjudicate a matter within the legislative competence of Iowa. The court below so held in this case, and has dealt with the matter more fully and to the same effect in another.[4]

The Natural Gas Act clearly discloses that, though its purpose may have been to protect the ultimate consumer at retail, the means adopted was limited to the regulation of sales in interstate commerce at wholesale, leaving to the states the function of regulating the intrastate distribution and sale of the commodity. That Congress intended to leave intrastate transactions to state regulation is clear, not only from the language of the Act,[5] but from the exceptionally explicit legislative record,[6] and from this Court's decisions.[7]

The showing made by the petitioner's pleadings, and not denied, is that in Iowa rates are set by municipal ordinance; that the rates collected from consumers during the refund period were the lawful rates, so fixed; and that the sums impounded were deducted from the payments to Pipeline by Central out of its own funds. The only reply

---

[3] *Central Kentucky Natural Gas Co.* v. *Railroad Commission,* 290 U. S. 264, 271, 272.

[4] *Natural Gas Pipeline Co.* v. *Federal Power Commission,* 141 F. 2d 27.

[5] See, e. g., § 2 (8), 15 U. S. C. § 717 (a) (8); § 5 (a), 15 U. S. C. § 717d (a); § 13, 15 U. S. C. § 717*l*; § 14a, 15 U. S. C. § 717m (a); § 15a, 15 U. S. C. § 717n (a); § 17 (a), 15 U. S. C. § 717 (p).

[6] H. R. No. 709, 75th Cong., 1st Sess., pp. 1–3.

[7] *Public Utilities Comm'n* v. *United Fuel Gas Co.,* 317 U. S. 456, 467; *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U. S. 591, 609–610.

made by the municipal authorities is that the fund belongs to the ultimate consumers. Whether this is so, whether under Iowa law reparation may be demanded for sums paid by consumers under a standing rate, we do not know. Nor do we know who are proper parties under Iowa law to any proceeding to determine the relative rights of petitioner and its customers. Certainly these are questions of Iowa, not of federal, law.

We are of opinion that the court below lacked jurisdiction to adjudicate the question of the consumers' rights in the fund in dispute. *United States* v. *Morgan,* 307 U. S. 183, on which the respondents rely, is obviously distinguishable. There the fund impounded was part of the charges paid to the stockyard merchants by persons who had been charged the rates found by the Secretary of Agriculture to be excessive. Here, since the fund represents a portion of sums paid by Central to Pipeline out of Central's funds and pursuant to contract with Pipeline, the *Morgan* case would be authority for repayment to Central. This is true also of *Inland Steel Co.* v. *United States,* 306 U. S. 153. Moreover, if Central had paid Pipeline the excessive rates, the latter could not have defended a suit by Central to recover the excess on the ground that Central had passed on the burden to its customers.[8]

The ultimate consumers' rights being such as the law of Iowa affords, there is no reason for the payment of the fund to municipalities or municipal officers under a quasi trust for those found ultimately entitled, thus placing the burden on Central to pursue the cities or their officers for its recovery. An order to this effect is certainly not within the court's jurisdiction as a federal court of equity. The most the court below should do, in view of the apparent controversy as to the consumers' right to a refund of

---

[8] *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.,* 245 U. S. 531.

rates heretofore paid to Central, is to order that the fund be held for a reasonable time to permit interested persons to litigate the issue in a tribunal having jurisdiction, the order to be conditioned that if such litigation is not instituted within a reasonable time, and prosecuted to final adjudication, the fund shall be paid over to Central, and that if it be adjudged as a result of such litigation that Central is indebted to its consumers because of the reduction of wholesale rates in this proceeding, further application may be made to the court as to its disposition.

The judgment is reversed and the cause remanded for further proceedings in conformity to this opinion.

*So ordered.*

MR. JUSTICE BLACK, dissenting.

The primary purpose of Congress in passing the Natural Gas Act was to protect ultimate consumers of gas from excessive prices. *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591, 610, 612. The Court's decision today defeats that Congressional purpose, for under its interpretation of the Act the petitioner, a retail gas distributor, is awarded a windfall,[1] at the expense of the very consumers the Act was designed to protect.

On September 23, 1938, a petition praying for reduction of the wholesale gas rates of the Natural Gas Pipeline Company was filed with the Federal Power Commission. July 23, 1940, the Commission ordered the Company to make reductions in its future rates. The Circuit Court of Appeals, upon the Company's petition, then granted a stay pending litigation. Later, it stayed enforcement of the order. 120 F. 2d 625. As a condition of its stay, the Circuit Court of Appeals required the Company to execute a million dollar bond running to the Federal Power

---

[1] The court below refused to construe the Natural Gas Act so as to make this petitioner "the beneficiary of a windfall, to which it intends to hold on, once it can get possession of it."

Commission and the Illinois Commerce Commission. On March 16, 1942, this Court reversed the cause and sustained the Commission's order. 315 U. S. 575.

Subsequently, $6,377,913.57 was paid into the court by the Pipeline Company, this being the amount it had collected, pending the litigation, from Illinois, Nebraska, and Iowa gas distributing companies, in excess of the rates fixed by the Commission.

The Pipeline Company, and all of the distributing companies except petitioner here and one small company in Nebraska,[2] acquiesced in the holding of the court below that the funds thus impounded properly belonged to the ultimate consumers, and should be refunded to them. All of this amount, $6,377,913.57, except for the $25,708.54 now ordered by this Court to be paid to the petitioner, has been distributed to the ultimate consumers.[3]

The Court holds that the disposition of such funds must be made in accordance with state law and that the Circuit Court of Appeals was without jurisdiction to dispose of

---

[2] This company subsequently settled with its consumers by turning over to them approximately 70% of the funds allocable to its purchases.

[3] June 30, 1942, after a notice had been issued to petitioner Central, the Court held that all refunds "belong to the consumers, for whose benefit these proceedings were instituted." Central did not actually intervene until fourteen months later. With reference to this delay of Central's the court below said in its June 30, 1942 order that "Nebraska City and all other utilities stood by and accepted the situation as it was tendered by the pleadings and the parties. Now one or two of these utilities located where no State Supervisory Commission exists, are endeavoring to seize the fruits of the litigation brought for the consumers and retain the money for their own individual gain. It would be a gross travesty upon the proceedings, the outcome, if they were to succeed. With their efforts in this respect, we have no sympathy." Without going into a narration of what later occurred, I am of opinion that the court rightfully denied Central's intervention on the ground that it had long since decided the question. The importance of the rule announced by the court, however, prompts me to discuss it.

them as it did. Until today, this Court seems never to have doubted that "it is a power 'inherent in every court of justice so long as it retains control of the subject matter and of the parties, to correct that which has been wrongfully done by virtue of its process'." *United States* v. *Morgan,* 307 U. S. 183, 197. Here, consumers of gas have been injured by a federal court order staying the Federal Power Commission's 1940 rate cut. In 1942, this Court sustained the Commission's order. 315 U. S. 575. At that time, the Pipeline Company contended before this Court that if the Commission's rate order should be sustained, the fund accumulated as a result of the stay should be retained by it, and should not be turned over to the distributing companies because "the purpose of the rate regulation is the protection of consumers and . . . will not be effectuated by refunds to wholesalers" of their "profits for past business." Upon our remand of the cause for further proceedings, the Pipeline Company petitioned the court below to take jurisdiction of the excess funds. That court held, in impounding the fund here involved, that since it was authorized by §§ 19 (b) and (c) of the Act to issue a stay pending review of the Commission's rate order, it had a mandatory obligation as a court of equity "to determine to whom and in what amounts the distribution shall be made." This holding was in accord with "the governing principle that it is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all—including the public—whose interests the injunction may affect." *Inland Steel Co.* v. *United States,* 306 U. S. 153, 157.

The injury to the consumers here did not stem from state law or the action of a state court; it was the direct result of stay orders made by a federal court. These orders, which permitted the Pipeline Company to continue to charge rates which the Commission had determined to be excessive, to the detriment of ultimate consumers, were

issued under the provisions of the Natural Gas Act. The injuries here were therefore occasioned by the application of federal law in a federal court, and raised federal, and not state law questions. For a federal court to remedy this injury by affording that protection to consumers which the act contemplated, cannot, in my judgment, be said to amount to a regulation of local gas rates.

The Natural Gas Act contemplates that federal reduction of wholesale gas rates to distributors will be reflected in reduction of retail rates to the ultimate consumers. Information before the Congress when it passed the Natural Gas Act showed that a large percentage of the retail cost of gas was attributable to the wholesale cost.[4] Thus the wholesale cost is a critical element in a state proceeding to regulate retail cost. An effective order of the Federal Power Commission reducing wholesale costs affords local consumers a basis for a corresponding retail reduction. But a federal rate reduction order cannot be utilized before state regulatory agencies where the federal reduction order has been stayed by a federal court. Thus, during the three years that the Power Commission's rate reduction was held in abeyance pursuant to the stay orders, the Iowa consumers were deprived of the opportunity to obtain a reduction of their rates from the local regulatory agencies. The City of Muscatine, Iowa, promptly passed an ordinance reducing local gas rates *after* vacation of the orders staying enforcement of the Power Commission's rate reduction.

Ultimate consumers can secure benefits from a federal rate reduction in two ways: (1) by using the order to get

[4] See Final Report of the Federal Trade Commission to the Senate, Sen. Doc. 92, Part 84–A, 70th Cong., 1st Sess., pp. 611, 612; Cong. Record, 75th Cong., 1st Sess., vol. 81, pp. 6723, 6725, 6728; Hearings Before the House Committee on Interstate & Foreign Commerce, 75th Cong., 1st Sess., on H. R. 4008, pp. 27, 38–39, 56–57; Hearing on H. R. 11662, House Subcommittee on Interstate & Foreign Commerce, 74th Cong., 2d Sess., pp. 25, 34–35, 81.

reduced rates before their local regulatory bodies; (2) by the impounding of funds for their benefit if a judicial stay of the federal reduction order is granted. The stay deprived these local consumers of a chance to use the Commission's order to obtain a local rate reduction. The holding of this Court partially, if not completely, deprives them of the benefits of the impounded funds. Cf. *First National Bank* v. *Flershem*, 290 U. S. 504, 520.

To deny petitioner distributing company a refund of the impounded monies would impose no deprivation upon it. Petitioner's local rates were fixed by a Muscatine city ordinance, to which rates the petitioner alleges it voluntarily agreed. That schedule of rates, petitioner argues, was "presumptively reasonable." [5] Petitioner admits that Iowa law requires the wholesale cost of gas to be one of the factors considered in determining the reasonableness of rates.[6] The petitioner's rates must therefore be considered reasonable on the basis of the old wholesale price of gas, and any increment above those rates is a "windfall."

Furthermore, the petitioner says it was free under Iowa law to attack the rates at any time as too low. This it never did. Instead, it refrained from doing so until this Court had sustained the Commission's order reducing wholesale rates, and until the Circuit Court of Appeals had adjudged that the monies belonged to the consumers. Not until then did it file its intervention claim for the impounded funds. The reason for this delay is not difficult to find. Petitioner, in arguing here that it should get

---

[5] Petitioner cites in support of its argument, *Iowa Railway & Light Co.* v. *Jones Auto Co.*, 182 Iowa 982, 164 N. W. 780; *Town of Williams* v. *Iowa Falls Electric Co.*, 185 Iowa 493, 170 N. W. 815; *Knotts* v. *Nollen*, 206 Iowa 261, 218 N. W. 563; *Mapleton* v. *Iowa Public Service Co.*, 209 Iowa 400, 223 N. W. 476.

[6] See *Cedar Rapids Gas Co.* v. *Cedar Rapids*, 144 Iowa 426, 120 N. W. 966, aff'd 223 U. S. 655.

this impounded fund, asserts that under Iowa law "municipalities may only fix rates prospectively." Iowa cases cited by the petitioner [7] seem to give some support to this contention, especially when considered with decisions of this Court dealing with analogous statutory situations.[8] I am therefore unable to see much likelihood of these consumers obtaining relief in the Iowa state courts for the injury they have suffered as a result of the federal court's action in granting a stay of the Federal Power Commission's order.

If my previous analysis is correct, the rule announced by the Court today means simply this: So long as litigation can be kept pending in the courts as to the validity of a Federal Power Commission rate reduction order, the benefits of the Natural Gas Act will be suspended as to ultimate consumers, and will be largely, if not exclusively, restricted to retail distributors.[9] Thus, by a strange quirk of statutory construction, the effort of Congress to protect consumers from excessive rates is transformed, where litigation is pending, into an Act which exploits consumers and unjustly enriches distributing companies. This Company has already received a reasonable compensation for

---

[7] See note 5, *supra*.

[8] Cf. *Public Utilities Commission* v. *United Fuel Gas Co.*, 317 U. S. 456; *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co.*, 284 U. S. 370, 389.

[9] When a rate schedule embodying a proposed increase in wholesale rates becomes effective, pending a determination by the Commission of the reasonableness of such increase, the Commission is authorized to require appropriate guarantees by § 4 (e) of the Act. The Commission may require the natural gas companies ". . . to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid . . ." This would appear to be broad enough to protect consumers where the amounts were paid in their behalf. Surely the Act gives no less power to a court.

its services. It is entitled to no more under Iowa or federal law.

MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE concur in this dissent.

MR. JUSTICE DOUGLAS, dissenting.

I think that the claims to the fund in possession of the court below are to be determined by state law. The Federal Power Commission has no authority to determine the rates which petitioner may charge in these Iowa cities. Under the Natural Gas Act that is for Iowa and Iowa alone to determine. *Public Utilities Commission* v. *United Fuel Gas Co.*, 317 U. S. 456, 467; *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U. S. 591, 610. In that respect this case differs markedly from *United States* v. *Morgan*, 307 U. S. 183. If there had been no stay order entered and the interstate rate from the Pipeline company to petitioner had been reduced when the Federal Power Commission entered its order, it still would have taken action by the local authorities to reduce the rates in these Iowa cities.

But the federal court which has this fund has considerable discretion in its management. *United States* v. *Morgan, supra.* I fail to see how it abused its discretion in handing the fund over to the local officials. It is only fair to assume that a reduction in the interstate rate would have been followed by a reduction in local rates.[1] That indeed was the primary objective of the Natural Gas Act. *Federal Power Commission* v. *Hope Natural Gas Co., supra.* We are pointed to no provision of local law which raises any substantial question concerning the power of the local authorities to make a readjustment of rates

---

[1] The City of Muscatine did in fact reduce the rates after the stay order had been vacated.

through the distribution of funds impounded under a stay order.[2] And the claim of petitioner that the local law would prevent a reduction in its rates for the period while the stay order was in effect is far too vague to acquire the dignity of a substantial question.[3] He who maintains that position has the distinct burden of overcoming the presumption that as a matter of local law the consumers were entitled to the benefits of this rate reduction. Petitioner fails to carry that burden. The record is void of any credible evidence that a reduction in the interstate rate would not have warranted a reduction in local rates.

Petitioner is adequately protected by the decree entered by the court below. That court did not undertake finally to determine the rights of the parties in the fund. It has turned the fund over to respondents without prejudice to petitioner's rights in it. Those rights are determinable under Iowa law. That procedure does not preclude petitioner from its day in an Iowa court if its claim to the fund turns out to be less frivolous and more substantial than it appears to be. I think the court below selected the most equitable and just method of rectifying the injury done by its stay order.

---

[2] Petitioner asserts, and I assume, that under the Iowa law rates can be made only prospectively. But it appears from *Town of Williams* v. *Iowa Falls Electric Co.*, 185 Iowa 493, 500, 170 N. W. 815, that the Iowa courts under their "balance of convenience" rule will impound alleged excessive amounts collected by a utility company pending the outcome of rate litigation so as to protect the rights both of the utility and the consumers. If the rate increase is ultimately disallowed, the impounded funds will be returned to the customers; otherwise they will be turned over to the company. We are pointed to no authority which suggests that Iowa would not sanction the use of such a method of readjustment under the circumstances of this case.

[3] So far as appears the rates which petitioner was charging during the period of the stay order had been voluntarily proposed by it.