**TEXAS EASTERN TRANSMISSION CORPORATION, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**NATURAL GAS PIPELINE COMPANY OF AMERICA, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

Nos. 22031, 22041, 23251, 22462, 22870.

United States Court of Appeals
Fifth Circuit.

Feb. 7, 1966.

Rehearing Denied in Nos. 22041, 22462, 22870, 23251 March 22, 1966.

See also, 5 Cir., 357 F.2d 230.

William W. Brackett, Chicago, Ill., for Natural Gas Pipeline Co. of America.

Jack D. Head, Houston, Tex., Keith M. Pyburn, Washington, D. C., David T. Searls, J. Evans Attwell, Harry M. Reasoner, Vinson, Elkins Weems & Searls, Houston, Tex., for petitioner, Texas Eastern Transmission Corp.

Howard E. Wahrenbrock, Sol., F. P. C., Washington, D. C., Richard A. Solomon, Gen. Counsel, Abraham R. Spalter, Asst. Gen. Counsel, Peter H. Schiff, Deputy Sol., Robert A. Jablon, Atty., Washington, D. C., for respondent, Federal Power Commission.

Robert W. Maris, Philadelphia, Pa., for intervenor, United Gas Improvement Co.

Before WHITAKER,* Senior Judge, and WISDOM and THORNBERRY, Circuit Judges.

WISDOM, Circuit Judge.

The novel orders of the Federal Power Commission attacked in these proceedings mark the Commission's decision to take a new and close look at its jurisdiction over refunds generated under Sec-

---

* Of the U. S. Court of Claims, sitting by designation.

tion 4(e) of the Natural Gas Act.[1] Does the statute permit and does sound policy require the Commission to control the disposition of refunds? To what extent may the Commission require the flow-through of refunds from natural gas producers to jurisdictional pipeline companies to non-jurisdictional local distributors and, indirectly, to the ultimate consumers for whom, the Supreme Court has said, the Act provides a "complete, permanent, and effective bond of protection"?[2] To obtain the answers to these and related questions, the Commission ordered United Gas Pipe Line Company to retain certain refunds, reflecting excessive earnings, "subject to further order of the Commission [*after a hearing*] directing the disposition of those amounts." These retention orders state that their purpose is to enable the Commission to determine "whether United's immediate customers, or the customers of such customers, are legally and equitably entitled to retain the refunds".

The petitioners, Texas Eastern Transmission Corporation and Natural Gas Pipeline Company, are interstate pipeline customers of United.[3] They assert that the Commission has no statutory authority to allocate refunds; that the retention orders violate express provisions of prior orders and related settlement agreements entitling the petitioners to

receive and retain the refunds for their own benefit; that petitioners did not pass on to their customers United's rate increases and that therefore they should not have to pass on refunds representing the rate increases; that the Commission's orders requiring Texas Eastern to reduce its rates for past periods constitute retroactive rate-making. Petitioners contend that the Commission has already decided the policy issues and that for this Court to give effect to the retention orders issued to United is to decide in advance the crucial questions purportedly at issue in the hearing ordered but yet to be held; that, therefore, the orders are reviewable. They ask for a stay of the hearing, pending a decision by this Court on the merits of their case.

The Commission has filed a motion to dismiss the petitions as premature. We grant the motion. The challenged orders do not attempt to determine the petitioners' rights to the refunds. The orders merely require the temporary retention of the refunds by a stakeholder, United, and establish a procedure for determining who is entitled to the funds in escrow. In the hearings to be held, the petitioners will be free to urge all the substantive contentions they assert in this proceeding.

We dismiss the petitions and the motions for a stay of the proposed hearing

1. 15 U.S.C. § 717c(e):

"Whenever any such new schedule is filed the Commission shall have authority * * * to enter upon a hearing concerning the lawfulness of such rate, * * * and, pending such hearing and the decision thereon, the Commission * * * may suspend the operation of such schedule and defer the use of such rate, * * * but not for a longer period than five months beyond the time when it would otherwise go into effect * * *. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. *Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the*

*Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom * * * paid, and, upon completion of the hearing and decision, to order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified. * * **" (Emphasis added.)

2. Atlantic Refining Company v. Public Service Commission of State of New York, 1959, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312, 1319.

3. Natural Gas Pipeline joins in most of Texas Eastern's arguments since its petition raises essentially the same issues. For convenience, however, we will in this opinion refer primarily to Texas Eastern and its fact situation.

on the ground that the challenged orders of the Commission are not yet ripe for judicial review.

## I. The Orders and Rate Settlements

A review of the pertinent orders and rate settlement agreements is essential to an understanding of the case.

### A. Refund Retention Orders: United's Refunds.

The challenged orders relate to three United increased rate filings (F.P.C. Docket Nos. RP61–18, RP63–1, and RP65–1) filed January 18, 1961, June 15, 1962, and July 15, 1964, respectively. The rates became effective, after the statutory five months suspension period, June 15, 1961, January 1, 1963, and February 1, 1965. The first two increased rates were put into effect subject to refund after the suspension period. The rates proposed in RP65–1 were reduced, before becoming effective, in accord with a settlement agreement, between United and its customers, approved by the Commission order of December 23, 1964.

(1) In Opinion No. 428, 31 F.P.C. 1180 (May 14, 1964), Opinion No. 428–A, 32 F.P.C. 687 (September 2, 1964) and Opinion No. 428–B, 32 F.P.C. 879 (September 30, 1964), the Commission settled most of the issues in United's RP63–1 rate increase proceeding. In Opinion No. 428 the Commission found that United's rates in effect from January 1, 1963 were excessive and ordered United to refund the excessive rates to its pipeline customers and ordered all jurisdictional customers of United to flow through to their customers all refunds received from United. The customers were not required to make refunds, if they protested, until they had been afforded a hearing.

In Opinion 428–A the Commission denied a rehearing but modified the order relating to refunds by specifying that United should retain all refunds due its customers under Docket No. RP63–1, pending "further order of the Commission directing disposition of those amounts". Along with this modification, the Commission ordered United's customers, including the petitioners, to file reports indicating whether they would flow through or retain any amounts United might refund. The Commission, without passing on the contention that it could not order refunds by United's customers, explained the procedure as follows:

> "Concededly, this is a novel question of great regulatory importance. But, we are here not concerned with the justness or reasonableness of these customers' present rates, per se. Rather, we are here faced with the proper and equitable distribution of a fund of money created by our own process. Under the Natural Gas Act we are concerned with the protection of the public interest involved in ' * * * selling natural gas for ultimate distribution to the public.' Merely ordering United to make refunds to its immediate customers could not fully discharge our responsibilities. We think, however, some modification of ordering paragraph (J) is appropriate to conform to the procedure recently prescribed in our order approving a settlement in Humble Oil & Refining Company, 32 FPC 49, Docket Nos. G–9287 and G–9288, issued July 8, 1964, where we provided that Humble should compute and report the amount of potential refunds and retain these amounts subject to further order. In general we shall follow this procedure here." 32 F.P.C. at 695 [4]

The same modifying order (No. 428–A) directed United to retain all refunds that might thereafter become due to the petitioners' customers and to United's jurisdictional customers as a result of an earlier United settlement (Docket No. RP61–18) approved by Commission order March 12, 1962. The Commission denied United's application for a rehear-

---

4. This approach originated in Hunt Oil Company, 30 F.P.C. 220 (1963).

ing in Opinion No. 428–B September 30, 1964.

In No. 22031 (Natural Gas) and in No. 22041 (Texas Eastern), the petitioners attack the order and Opinion No. 428, as modified by Nos. 428–A and 428–B, in United's last decided rate case No. RP63–1, ordering United temporarily to retain the amounts refundable to its customers under its 1961 and 1963 dockets.

(2) In the United 1964 Rate Settlement Approval Order, 32 F.P.C. 1515, (December 23, 1964) the Commission approved the settlement of all United's rate increase cases then pending before the Commission or this Court including No. RP65–1. The Commission again directed United to retain all amounts refundable to Texas Eastern under the 1962 United settlement (No. RP61–18) and 1964 opinions (No. RP63–1). The order also provides for retention of refunds arising under this new RP65–1 settlement. February 19, 1965, in denying Texas Eastern's application for a rehearing, the Commission explained its position as follows:

"Texas Eastern advances a number of reasons why it believes any refusal on the Commission's part to order United to pay over the amounts in question to it without condition or limitation would be legally or equitably unsound. We do not believe it necessary or appropriate to consider these claims here, since they are all considerations which Texas Eastern can restate and which we will consider in reaching our final determination upon the basis of the factual record made in the hearing to be held in this matter. * * * Texas Eastern will, of course, be fully heard on all relevant claims before we reach any conclusion adverse to its claims to entitlement to the refunds from United. We reiterate that we have not yet determined whether it is or is not entitled to retain any or all of such amounts.

However, Texas Eastern's apparent view that the Commission must decide the validity of its claims on the pleadings and cannot in the exercise of its discretion defer such determination until after it can do so in the light of a full hearing record in an ancillary proceeding in which other interested parties will also have an opportunity to present factual information and legal arguments they may deem material is clearly lacking in merit." 33 F.P.C. at 304–305.

In No. 22462 Texas Eastern petitions for review of this settlement order.

### B. *Refund Release Order* (Humble Refunds)

In No. 22870 Texas Eastern petitions for review of an April 21, 1965 order (RP65–27) directing Humble Oil & Refining Company to release a portion of refundable amounts the Commission had ordered frozen July 8, 1964 (32 F.P.C. 49, 52). In that order the Commission explained at length its purposes and proposed procedure:

The purchasers of gas under the various rate schedules to which this settlement proposal relates are all natural gas pipeline companies subject to our jurisdiction under the Natural Gas Act, and many of these purchasers in turn have customers who are natural gas pipelines. Some of these pipeline customers of Humble or of Humble's customers are required under express provisions of outstanding orders of this Commission to flow through to their customers all or part of any of the refunds they may receive from Humble as a result of this settlement; others may choose to do so in the absence of such express provisions. But in view of our duty to insure that the ultimate consumers of gas actually receive all of the benefits of our rate regulation to which they may be entitled, we shall take action here to assure that, within the limits of our jurisdictional reach, the refunds to be ordered ac-

tually flow to those parties legally and equitably entitled thereto.

We are not here determining that a pipeline purchaser from Humble or one down the line in the chain of resales between the producer and ultimate consumer are never entitled as a matter of law or equity to retain all or part of the refunds received from a supplier. We conclude only that merely because a pipeline is under no special express requirement to flow refunds through to its customers and did not previously pass on to its customers the producer's price increase (or higher gas costs arising from sales temporarily certified at prices higher than that fixed in the settlement), does not determine that it is entitled to retain such refunds.

■ In the April order before us, the Commission directed Humble to release a portion of its refunds to United, Southern Natural Gas Company, and Texas Gas Transmission Corporation. At the same time it directed these three companies to defer the flow-through of any portion of these refunds attributable to Texas Eastern.[5] No. 22870 was not consolidated with the cases now before us. However, because of the similarity of No. 22870 with the cases now before us, the Court and the parties considered the petitioner's motion for a stay and the respondent's motion to dismiss the petition.

### C. Refund Hearing Order
### (October 4, 1965)

In its order of February 19, 1965, denying Texas Eastern's application for rehearing in RP63–1, the Commission explained that it would pass on the merits of Texas Eastern's contentions in the ancillary proceeding contemplated by the settlement order as to those customers who claimed a right to retain for themselves refunds from United. October 4, 1965, the Commission initiated such a proceeding and ordered Texas Eastern to prepare reports by November 19, 1965, in preparation for hearings on issues involved in distribution of the retained refunds. Texas Eastern moved October 13, 1965 under the All Writs Section (28 U.S.C. § 1651) for a stay of the refund hearing order to protect this Court's jurisdiction in its review of the retention orders. The Commission thereupon postponed the effective date of the hearing order to January 3, 1966 and later extended it to a date to be fixed after the issuance of this opinion. Texas Eastern has also filed a petition (No. 22351) for review and stay of this hearing under Section 19 of the Act.

### D. Rate Settlements

(1) January 25, 1961 the Commission approved the Texas Eastern 1961 Rate Settlement (Docket Nos. G–12706 and G–18841), 25 F.P.C. 172. This settlement established rates for Texas Eastern's future sales based upon a test year cost-of-service determination. The settlement takes into account rate increases

---

5. The July 8, 1964 Humble Oil & Refining Company order, 32 F.P.C. 49, was the first retention order involving Texas Eastern. It established a framework for future disposition of the refunds. In two later orders the Commission directed Humble's pipeline customers (United, Southern, and Texas Gas Transmission among others) and the other pipelines in its resale chain (including Texas Eastern) to report their intended disposition of Humble funds. Humble Oil & Refining Company, 32 F.P.C. 873 (September 29, 1964), 33 F.P.C. 19 (January 5, 1965). Upon analysis of these reports the Commission found in its April 21, 1965 order unquestionable flow-through

obligations on the part of some pipelines and questionable obligations on the part of others. Some nonjurisdictional distributions were discovered. In the April order the Commission recognized the possibility that a pipeline might disagree with its conclusions regarding its flow-through obligations. Texas Eastern is one pipeline that does disagree. The Commission invited disagreeing pipelines "to voluntarily assume an obligation to flow-through the refund it would receive though it is not so obligated by prior Commission order," but Texas Eastern preferred to seek review in this court of the Commission's entire retention and partial release procedure.

then being paid by Texas Eastern to some of its suppliers (including United), under pending applications that might later be denied. Texas Eastern agreed to flow through to its own customers any refunds that might be received from its suppliers in certain of their pending proceedings listed in an appendix to the agreement. The flow-through provision would apply from December 1, 1959 to the effective date of Texas Eastern's next rate increase. Among the applications listed were six of United filings: Nos. G–9547, G–10592, G–12801, G–15360, G–18406, and RP60–2.

(2) The United 1962 Rate Settlement, 27 F.P.C. 504 (March 12, 1962) covered all the dockets enumerated in the appendix to the Texas Eastern 1961 settlement plus an additional docket, No. RP61–18, based on a 1961 United application not mentioned in the 1961 Texas Eastern settlement. As a result of this 1962 settlement, United made refunds to Texas Eastern both for flow-through to Texas Eastern's customers and for Texas Eastern's own enjoyment under Docket No. RP61–18.

The settlement in Docket No. RP61–18 also obligated United to flow through future refunds received from its suppliers to Texas Eastern and other jurisdictional customers. Accordingly, the Commission's order issued March 12, 1962 approving the settlement, required that United "shall pass on to its jurisdictional customers * * * such refunds including interest as it may receive from its suppliers under Sections 4 and 7 proceedings under the Natural Gas Act in accordance with Article V" of the settlement agreement.

Texas Eastern asserts, as fundamental to its position, that it absorbed a rate increase as a result of the United settlements. Texas Eastern contends that (a) the new United rates were higher than the cost of gas reflected in its own rate settlements for the periods covered;

and (b) that the company did not "track" United's increases with subsequent increases to their own customers. Texas Eastern asserts a net increase of $1,336,000 a year brought about by the United rate changes in RP61–18 and RP63–1, or $2,225,000 for the 20 month period covered (January 1, 1963 to August 31, 1964).

The Commission concedes that petitioners did not "track" the United rate filings with applications of their own. And it agrees, for sake of argument, that the new United rates might be higher than the old. But the Commission urges that even the $2,225,000 United rate increase Texas Eastern allegedly absorbed falls short of the $6,204,696 in refunds claimed for the same 20 month period. The Commission would look not only to the difference in United's rate schedules, but also to petitioners' "actual average cost of gas" for the period, including zone differentials and average load factors. In short, the petitioners are in sharp disagreement with the Commission on the increase-decrease issue. The Commission has made no findings on the issue, however, and has discussed it only in the briefs, arguing that the present record is insufficient to make adequate findings on this point.

## II. The Retention Orders are not Reviewable

Justice Frankfurter has stated the test of ripeness succinctly:

"Whether 'justiciability' exists * * * has most often turned on evaluating both the appropriateness of the issue for decision by courts and the hardship of denying judicial relief." [6]

Applying that test here, we hold that a judicial decision on the merits at this point would be inappropriate. We hold too that the hardship of denying relief to the petitioners is not sufficient to overcome the factors supporting the pre-

---

6. Joint Anti-Fascist Refugee Comm. v. McGrath, 1951, 341 U.S. 123, 156, 71 S.Ct. 624, 640, 95 L.Ed. 817, 845 (concurring opinion). See Jaffe, Judicial Control of Administrative Action 397 (1965); Davis, Administrative Law §§ 21.01–21.02 (1958).

requisite of final administrative action on the material issues.

A. The Commission itself has not yet made a definitive ruling on the extent of its authority over the disposition of refunds. Nor has it determined how its authority, such as it is, should be exercised to effect an equitable distribution of the funds in question. In its opinion, orders, briefs, and arguments to this court, the Commission has committed itself to the view that the challenged retention orders provide only "a mechanism for examining the problem". As stated in the Commission's first brief, "It may well be, that after hearing the parties who claim an interest in the refunds, the Commission may agree entirely with Texas Eastern's (and Natural's) claim of entitlement". As set forth in the order of February 19, 1965:

> " * * * [W]e cannot convert into a final determination our intention to conduct further proceedings on the appropriate disposition of refunds United is required to make. Texas Eastern will, of course, be fully heard on all relevant claims before we reach any conclusion adverse to its claims to entitlement to the refunds from United. We reiterate that we have not yet determined whether it is or is not entitled to retain any or all of such amounts." 33 F.P.C. at 305.

The Commission has followed a pattern of continuing supervision over refunds; generally, without the petitioners objecting. For example, January 7, 1963, the Commission directed United to refund to its customers the amounts they were entitled to receive as a result of a post-audit proceeding following the 1962 settlement agreement, but ordered United to retain $213,838 due Texas Eastern "for refund, together with interest computed at 7% per annum" subject to the subsequent determination of a rate design issue. Texas Eastern did not appeal this order of retention.

After careful examination of all the Commission orders in this record, we cannot say that the Commission at any point surrendered its jurisdiction over the refunds retained by United and other suppliers or committed itself to an inflexible flow-through policy. The leitmotif running through all the Commission orders and briefs in this proceeding is expressed in its October 4, 1965 order:

> "[W]e have not made any determination that Texas Eastern is not entitled to receive and retain such monies. We have determined only that in view of the apparent excess in revenues otherwise enjoyed by Texas Eastern during the years to which these refunds apply, a substantial question arises as to the pipeline's legal and equitable claims to such refunds and that our final decision thereon should be made upon the basis of a full hearing record on all pertinent factual and policy matters."

B. Review of an innovative administrative decision is difficult enough for a court even with the benefit of adequate administrative findings based on a hearing. Here we have before us only the Commission orders, the settlement agreements, and some other administrative materials—all raw materials. Review of the challenged orders would require the Court to construe settlement agreements previously approved by the Commission, and, in empty space, to find, among other facts, that petitioners would not receive a windfall. Review would force the Court to examine, without Commission assistance, hundreds of pages of tariff sheets, revenue reports, rate schedules, and refund calculations. The Court's original determination of the Commission's authority based upon these raw materials would turn the administrative process upside down and tend to stultify the agency's power to adapt its statutory authority to changing realities.

C. The financial impact of the refund orders on petitioners is considerable. If the petitioners are legally correct, they are entitled to the use of refunds *now*. United has deposited the refunds due Texas Eastern under an escrow agreement which permits the investment of

the amount subject to refund in short term U. S. government obligations. Under the Commission's orders United is thereby relieved from any further obligation to pay interest on the funds. In its October 4, 1965, hearing order the Commission estimated that United then owed Texas Eastern about 7.7 million dollars under the refund retention orders. Accepting the petitioners' assumption that these funds are invested in securities yielding an average of about 4% and apply the 6½% annual rate of return on investment now allowed by the Commission, the annual detriment to Texas Eastern could be as high as $192,500. We cannot measure the inconvenience and cost of protracted possibly duplicative litigation involved in the comprehensive hearings contemplated by the Commission's October 4, 1965, hearing order.

On the other hand, the Commission alleges that staff studies of Texas Eastern's actual costs and earnings for 1962, 1963, and 1964 indicate that without regard to the refunds in issue here, the company earned a jurisdictional return of 6.85 per cent in 1962; 7.25 per cent in 1963; and 7.18 per cent in 1964. Measured against a 6½ rate of return, these excess earnings amount to $4,950,-000 in 1962, $10,500,000 in 1963, and $9,220,000 in 1964 from Texas Eastern's jurisdictional operations and sales.

■ In this early stage of shaping policies covering refunds, the Commission has simply faced up to the existence of a serious problem: Perhaps because of procedures required by the Natural Gas Act but in any event through its own process, the Commission has created enormous funds subject to various equitable claims. From well-head to pipe-burner any or all of the distributors and users of United's natural gas may have equitable claims to the refunds. But overriding all claims is the public's interest in Commission procedures and process that will produce reasonable rates. The dimensions of the problem, including particularly the responsibility of the Commission to discharge its statutory duty to protect the public interest, require that the Commission give full consideration to all of the relevant legal and policy issues. We do not see how the Commission can accomplish that purpose without a searching inquiry into all of the conflicting considerations against a backdrop of cold facts, practical consequences, and statutory purposes.

D. In reaching the conclusion to dismiss the petition, we rely on the unripeness of the challenged orders for judicial review at this stage of the Commission's development of policies and techniques for handling refunds. Decisions of the Supreme Court and of this circuit support the result we reach.

In Humble Oil and Refining Company v. Federal Power Commission, 5 Cir. 1956, 236 F.2d 819, 822, echoing the test stated in Federal Power Commission v. Metropolitan Edison Company, 1938, 304 U.S. 375, 385, 58 S.Ct. 963, 82 L.Ed. 1408, we said:

"[T]he Act contemplates a review by this Court of definitive orders entered after hearing and upon completion of the administrative process."

*Humble* involved a petition for review of an order suspending an increased rate. The petitioner claimed the irreparable loss of $22,500 per month. The Court concluded that "a realistic appraisal of the order and the function it performs demonstrates that it is interlocutory and that its issuance had but one objective in view, to maintain the status quo between the seller and purchaser pending the exercise of the Commission's statutory jurisdiction." 236 F.2d at 823. The Court went on to say:

"What is really sought by petitioner is that this Court should halt inquiry at the threshold in order to rule *in limine* upon the propriety of the Commission's action and whether it should proceed further. It may be desirable that the law should pro-

vide for a preliminary judicial review of questions of this kind, but in the absence of such a provision we cannot assume that power."

In *Humble,* as in this case, the petition for review presented a question of contract rights which the Commission had not yet decided.

In a decision contemporaneous with Humble, Magnolia Petroleum Company v. Federal Power Commission, 5 Cir. 1956, 236 F.2d 785, 791, the Court again used the rubric, "definitive orders entered after hearing and upon completion of the administrative process." In that case the rationale was that "construction [of a "general" order promulgating regulations governing independent producers was] * * * still in the hands of the Commission, and this being so we cannot under the limitations of Section 19(b) sit in judgment upon practical business consequences * * *." Similarly, in City of Corinth v. Federal Power Commission, 5 Cir. 1958, 268 F.2d 10, cert. denied, 361 U.S. 900, 80 S.Ct. 209, 4 L.Ed.2d 156, a retail distributor asserted that a Commission order affected rights fixed by contract that, allegedly, the Commission was not authorized to change. We dismissed the petition as "interlocutory, procedural and ministerial" and ordered that "the grounds here asserted should first be considered and passed upon by the Commission."

Petitioners' reliance on Texas Eastern Transmission Corporation v. Federal Power Commission, 5 Cir. 1962, 306 F.2d 345, cert. denied Manufacturers Light & Heat Co. v. Texas Eastern Transmission Corp., 1963, 375 U.S. 941, 84 S.Ct. 347, 11 L.Ed.2d 273, to justify review of the retention orders is misplaced. In that case, the Commission had already made a final determination that Texas Eastern was not entitled to the controverted refunds. The petitioner claimed under an approved settlement agreement. Texas Eastern in that case already possessed the funds; as a final order the Commission directed petitioner to flow refunds through to its customers. No question was raised by the Commission of the reviewability of its order under Section 19(b) of the Act. This Court disagreed with the Commission's construction of the settlement agreement in that case and reversed the flow-through order. The critical difference between the cases is not that here Texas Eastern's suppliers still retain the funds. Rather it is that the Commission in *Texas Eastern* had already made a thorough investigation of the facts and a final disposition of the funds. The Commission's entire approach in this case is different. Here the Commission has only now begun to carry out its order for hearings involving (1) construction of the settlement agreements, and (2) applications of its statutory refund authority to distribute refunds covered by the settlements.

In Federal Power Commission v. Tennessee Gas Transmission Company, 1962, 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199, the Supreme Court stressed the flexibility of the Commission's power over refunds. That was a Section 4(e) case involving an order the converse of those here under consideration. Under its Section 16 power, the Commission had ordered an interim rate reduction and refund of amounts collected in excess of it; the Commission had found Tennessee Gas's rate increase unjustified in several respects, but had deferred the remainder of the investigation. The Court approved the use of the interim order technique as "in keeping with the purposes of the Act 'to protect consumers against exploitation at the hands of natural gas companies * * *,' Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. 591, 610 [64 S.Ct. 281, 88 L.Ed. 333 (1944)], and 'to underwrite just and reasonable rates to the consumers of natural gas. * * *' Atlantic Refining Co. v. Public Service Comm. of New York, 360 U.S. 378, 388 [79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959)]." 371 U.S. at 154, 83 S.Ct. at 216. To be sure, the refund orders in Tennessee Gas came mid-

way through a Section 4 proceeding, while the retention and release orders in this case were issued at the termination of such a rate investigation. But we see no essential distinction between the Commission's jurisdictional power in the two situations.

Two other Supreme Court opinions throw light on the dimensions of the problem of refunds. In Central States Electric Company v. City of Muscatine, 1945, 324 U.S. 138, 65 S.Ct. 565, 89 L.Ed. 801, pending judicial review of an FPC order reducing rates, a federal court of appeals granted a stay and ordered funds to be paid into the registry of the Court, representing the difference between the rate charged by a public utility selling natural gas at wholesale to a distributor and the reduced rate fixed by the Federal Power Commission. The Supreme Court held that the federal court had no jurisdiction to determine whether the funds should be paid to the distributor or to the ultimate consumer, because the Commission had no jurisdiction to have made such an order under the Natural Gas Act. But the Court stated that the circuit court should hold the fund intact until consumers had been afforded a reasonable opportunity to litigate their rights to the funds in state courts; disposition of the funds was to be within the limits of FPC jurisdiction. In the case before this Court, the Commission analogizes its powers to those of the court in Central States Electric Co. v. City of Muscatine with respect to the distribution of funds accumulated under a Section 19(c) stay.

In Federal Power Commission v. Interstate Natural Gas Company, 1949, 336 U.S. 577, 69 S.Ct. 775, 93 L.Ed. 895, pending determination of the validity of a Commission order reducing rates on sales of natural gas by a producer to pipelines selling to distributors and industrial consumers, the Court of Appeals impounded the difference in amounts between the rate charged and the new rate. The Court upheld the reduction

order. The pipeline companies then claimed the refunds as having been created by their payments. The Supreme Court held that the Court of Appeals should determine who would have been benefited had the rate order not been paid, and should distribute the funds accordingly.

In the majority opinion the Court answered the argument of the pipeline companies, in part, as follows:

"The basis of the claim stated in their petitions for intervention is that they are entitled to the fund as of right, since it was created by their *payments*. But we would be unmindful of the purpose of the Act and the responsibility of the federal courts under it, if we so ruled. The aim of the Act was to protect ultimate consumers of natural gas from excessive charges. * * * " 336 U.S. at 581, 69 S.Ct. at 778.

Justice Douglas, for the majority, pointed out that disposition of the funds accumulated under a stay or refund order is not rate making:

"It is said that the federal court could not by pass the pipe-line companies without undertaking to pass on the reasonableness of the rates which they have charged—a matter beyond its competence except on review of orders of the Commission. But it is not rate making to determine the equity of the claim of the pipe-line companies to the fund. The federal court, through exercise of its power under § 19 of the Act, issued the stay order under which the fund was accumulated. When a federal court of equity grants relief by way of injunction it has a responsibility to protect all the interests whom its injunction may affect." 336 U.S. at 582, 69 S.Ct. at 778.

Justice Douglas recognized the significance of the rate increase-decrease issue in the exercise of the Court's equity pow-

er over refunds; he would "call upon the Federal Power Commission for information relevant to it." Ibid. Justice Frankfurter suggested that "the Court of Appeals should ask the Federal Power Commission for an advisory report" on this and related issues. 336 U.S. at 589, 69 S.Ct. at 782. Justice Black, in an opinion concurred in by Justices Murphy and Rutledge, agreed with the result, but dissented from the directions given the circuit court on the ground that while distribution should be made to the ultimate consumers, such distribution was wholly a matter of federal law. Justices Jackson and Burton, in a separate opinion, expressed agreement with some but not all of the instructions to the court below.

The analogy of court-impounded funds to Commission-ordered refunds may not be a perfect analogy. The ability of the Commission to determine an equitable distribution of refunds may be less or more than that of a court. Both the petitioners and the Commission extract aid and comfort from *Interstate*. In short, the state of the law, as well as the procedural posture of the controversy, argues strongly for judicial hands off until the Commission has, in the first instance, decided where it wants to go and what it wants to do with refunds.

For the foregoing reasons, the Court grants the respondent's motions to dismiss the refund review proceedings consolidated for purposes of this opinion.[7] The Court orders the petitions dismissed as to the refund issue without prejudice to the petitioners to assert in other proceedings before the Federal Power Commission and in the courts their substantive contentions asserted in this proceeding. Texas Eastern's applications for stay are denied.

7. The original petitions for review in Nos. 22031 and 22041 raised numerous issues in addition to the refund question. This court March 3, 1965 dismissed all issues except the refund issue and a consolidated tax issue. The tax question was sev-

ered and argued before another panel. See United Gas Pipe Line Co. v. Federal Power Commission, 5 Cir. 1966, 357 F.2d 230. We dismiss the petitions in Nos. 22031 and 22041 only as to the refund issue.