## Attorney General *vs.* Department of Telecommunications and Energy; Boston Edison Company & others,[1] interveners (and a consolidated case[2]).

Suffolk. November 5, 2002. - December 16, 2002.

Present: Greaney, Spina, Cowin, Sosman, & Cordy, JJ.

*Department of Telecommunications and Energy. Public Utilities,* Electric company, Judicial review, Rate setting. *Administrative Law,* Agency, Judicial review, Rate setting. *Corporation,* Merger.

On appeal pursuant to G. L. c. 25, § 5, from a final order of the Department of Telecommunications and Energy (department) that approved a rate plan filed by utilities pursuant to G. L. c. 164, § 94, in connection with the proposed merger of their parent companies, this court reviewed the department's finding to determine only whether there had been an error of law, and it declined to substitute its judgment for a judgment of the department regarding energy policy that could not be said to be irrational. [267]

In proceedings before the Department of Telecommunications and Energy for review of a rate plan filed by certain gas and electric companies (distribution companies) pursuant to G. L. c. 164, § 94, in connection with the proposed merger of their parent companies, the department did not err in approving a four-year freeze in distribution rates and allowing merger-related costs, in the absence of an investigation, pursuant to § 94, into the propriety of the rate plan to determine if the rates were just and reasonable, where the distribution companies' rate plan sought only an adjustment in certain rates and a rate freeze, not a general increase in rates; further, the department's decision to apply the "public interest" standard for merger approvals pursuant to G. L. c. 164, § 96, was proper. [267-270]

This court declined to consider the argument of the Attorney General that, in applying the "public interest" standard for approving a rate plan filed by utilities pursuant to G. L. c. 164, § 94, in connection with a proposed merger, the Department of Telecommunications and Energy improperly revived a ratemaking practice known as the "fair value" method, where such contention had not been raised before the department. [270]

In proceedings before the Department of Telecommunications and Energy for review of a rate plan filed by certain gas and electric companies (distribu-

---

[1]Cambridge Electric Light Company (Cambridge Electric), Commonwealth Electric Company (Commonwealth Electric), and NSTAR Gas Company (distribution companies).

[2]The Energy Consortium & another *vs.* Department of Telecommunications and Energy.

tion companies) pursuant to G. L. c. 164, § 94, in connection with the proposed merger of their parent companies, the department's adjustment of distribution rates for two of the distribution companies, while fully offset by decreases in their respective transition charges, did not represent "a general increase in rates" under § 94, thereby requiring a rate investigation. [270-271]

On appeals pursuant to G. L. c. 25, § 5, from a final order of the Department of Telecommunications and Energy (department) that approved a rate plan filed by utilities pursuant to G. L. c. 164, § 94, in connection with the proposed merger of their parent companies, this court rejected various arguments that the department's approval of the rate plan violated requirements of § 94, and other arguments based on the incorrect premise that a § 94 investigation into the "propriety" of rates was required. [271]

On appeals pursuant to G. L. c. 25, § 5, from a final order of the Department of Telecommunications and Energy (department) that approved a rate plan filed by certain gas and electric companies (distribution companies) pursuant to G. L. c. 164, § 94, in connection with the proposed merger of their parent companies, this court concluded that the department's treatment of costs and savings allocation, requiring the distribution companies to develop a cost allocation system consistent with department precedent and ordering them to submit their allocation method on the earlier of two events (either within ninety days following the end of a four-year freeze in distribution rates or upon the filing of a petition for rate relief pursuant to § 94) constituted a permissible exercise of its discretion. [271-272]

In proceedings before the Department of Telecommunications and Energy (department) for review of a rate plan filed by certain gas and electric companies pursuant to G. L. c. 164, § 94, in connection with the proposed merger of their parent companies, the department properly concluded, in the exercise of its discretion, that the combination of a four-year freeze in distribution rates together with merger-related savings would not necessarily produce excessive earnings during the rate freeze, and would not, in the distribution of costs and savings, result in a "net harm" to customers, and thus, properly permitted the rate plan in the exercise of its considerable discretion; further, the plaintiffs contesting the approved rate plan failed to meet their burden of establishing that the department's approval of the rate plan was unsupported by substantial evidence. [272-273]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on August 16 and August 25, 1999, respectively.

The cases were consolidated and reported by *Francis X. Spina,* J.

*Alexander J. Cochis,* Assistant Attorney General (*Joseph W. Rogers,* Assistant Attorney General, with him) for the Attorney General.

*John A. DeTore* (*Gerald J. Caruso* with him) for The Energy Consortium & another.

*Paul W. Johnson,* Special Assistant Attorney General (*Paul G. Afonso* with him) for Department of Telecommunications and Energy.

*Robert J. Keegan* (*David S. Rosenzweig* with him) for NSTAR Gas Company & others.

GREANEY, J. These consolidated cases, which are before us on a reservation and report, without decision, by a single justice of this court, involve consolidated appeals pursuant to G. L. c. 25, § 5, from a final order of the Department of Telecommunications and Energy (department) that approved a rate plan filed by Boston Edison Company, Cambridge Electric Light Company (Cambridge Electric), Commonwealth Electric Company (Commonwealth Electric) and Commonwealth Gas Company[3] (distribution companies) pursuant to G. L. c. 164, § 94,[4] in connection with the proposed merger of their parent companies[5] to create NSTAR.[6] The proposed rate plan had three main components: (1) a four-year freeze in distribution rates; (2) the recovery of merger-related costs; and (3) a service-quality plan. In addition, two of the distribution companies, Cambridge Electric and Commonwealth Electric, sought, and obtained, an upward rate adjustment in their existing retail distribution rates to correct an alleged error made in the course of a prior proceeding. The Attorney General, together with the Energy Consortium (TEC) and President and Fellows of Harvard College (Harvard) (appellants), interveners in the proceedings before the department,[7] essentially argue that the department (1) applied an erroneous standard of review in evaluating the rate plan; and erred in approving (2) the four-year rate

---

[3]Commonwealth Gas Company subsequently changed its name to NSTAR Gas Company.

[4]General Laws c. 164, § 94, grants the department the authority to approve of, and regulate, rates imposed by gas and electric companies within its jurisdiction.

[5]BEC Energy was the parent company of Boston Edison Company and Commonwealth Energy System was the parent company of Cambridge Electric, Commonwealth Electric, and Commonwealth Gas Company.

[6]The merger itself did not require approval from the department because the parent companies were not subject to G. L. c. 164. Conversely, the distribution companies are subject to the department's jurisdiction. See G. L. c. 164, §§ 1, 2, 3.

[7]The Attorney General intervened as a matter of right pursuant to G. L. c. 12, § 11E. The department permitted TEC and Harvard to intervene.

freeze; (3) the recovery of merger-related costs; and (4) the adjustment to Cambridge Electric's and Commonwealth Electric's distribution rates. We reject these arguments, and remand the cases to the county court for the entry of a judgment affirming the department's decision and order.

The background of the cases is as follows. On February 1, 1999, the distribution companies filed their rate plan with the department. They represented that consummation of the merger was contingent on the department's approval of the plan. The plan was filed expressly pursuant to § 94. The distribution companies requested that the department approve the plan "as just and reasonable and consistent with the public interest," and as consistent with "[d]epartment precedent."

As previously stated, the rate plan had three main components: (1) a four-year freeze in distribution rates for the distribution companies from the date of the consummation of the merger; (2) the recovery of merger-related costs; and (3) a service-quality plan to prevent any degradation in service as a result of the merger. Because the first two components of the plan are at issue, some additional information concerning these components follows. With respect to the rate freeze,[8] the distribution companies maintained that the proposed four-year freeze in distribution rates provided assurance that, during the four-year period, customers would be shielded from their (the distribution companies') inability to achieve projected cost savings from the merger, and from otherwise potentially recoverable inflationary increases in costs. At the expiration of the four-year rate freeze, distribution rates established by the department in any base rate proceeding would account for savings realized from the merger, net of the recovery of merger-related costs. The distribution companies proposed to demonstrate that merger-related savings would exceed merger-related costs, so that they would not have to make such a showing as part of any future rate proceeding.

The merger-related costs consist of transaction costs, system

[8]For Cambridge Electric and Commonwealth Electric, the rate freeze proposed would reflect an upward rate adjustment in their distribution rates to account for an alleged error that had been made in a prior proceeding. More discussion on this aspect of the proposal will follow.

integration costs, and the acquisition premium. Transaction costs include "professional fees paid for assistance on certain aspects of the merger" (such as fees for bankers, lawyers, and consultants), regulatory process costs (the cost of presenting the rate plan as well as required filings, such as filings with the Securities and Exchange Commission), and communication costs (the cost of disseminating information to shareholders, employees, customers, vendors, and others). System integration costs include employee separation, retention, and relocation costs; information technology integration costs; telecommunications costs; insurance costs; transition costs incurred for outside services intended to facilitate the merger; and facilities reconfiguration costs. The acquisition premium represents "the difference between the acquisition price and the net book value of the acquired company." Here, the acquisition premium would be the premium over book value that the shareholders in Commonwealth Energy Systems received for their shares.

The distribution companies proposed to recover merger-related costs in two ways. First, for ratemaking purposes, they proposed to amortize the transaction and system integration costs (and associated tax effects) at the rate of $13.5 million a year over a ten-year period. Second, they proposed to amortize the acquisition premium at the rate of $20.6 million a year over a forty-year period.[9] The distribution companies represented that, "[a]lthough the [r]ate [p]lan provides shareholders the opportunity to recover the up-front costs . . . the magnitude and permanence of the customer benefits will produce a value for customers that far outweighs the associated costs."

In their rate plan the distribution companies sought to adjust the base rates of Cambridge Electric and Commonwealth Electric to correct an alleged error made in the calculation of base rates in their respective restructuring plans mandated by § 193 of St. 1997, c. 164, "An Act relative to restructuring the

---

[9]Under generally accepted accounting principles, the merger was accounted for as a "purchase accounting" transaction. In accordance with this type of accounting method, any acquisition premium paid is recorded on the books of the acquired company and is amortized over a certain time period not to exceed forty years. Without the approval of the department, the distribution companies could not place or "push" this expense on their books and attempt to recover it.

electric utility industry in the Commonwealth, regulating the provision of electricity and other services, and promoting enhanced consumer protections therein" (Act), which added § 1A to c. 164 (requiring an electric company organized under the Act to file, by January 1, 1998, a "restructuring plan" that must include, among other requirements, an accounting of transition costs eligible for recovery, strategies to mitigate transition costs, and "unbundled prices or rates for generation, distribution, transmission, and other services"). See G. L. c. 164, § 1D ("Beginning January 1, 1998, all electric and gas bills sent to a retail customer shall be unbundled to separately reflect the rates charged for generation, transmission, and distribution services . . . contained in the total retail price"). When the two companies developed their restructuring plans and filed "unbundled" rates with the department, they had erred, to their detriment, in determining the proper level of distribution rates. This error occurred because when "unbundling" rates, they used incorrect figures representing demand-side management (DSM) charges[10] (they used figures from the wrong year: Act-mandated figures rather than pre-Act figures), and thus erred in determining the proper level of distribution rates. To recoup the shortfall, the distribution companies proposed an adjustment, a calculated increase, to the distribution rates for Cambridge Electric and Commonwealth Electric. To ensure that there would be no over-all rate increase, the distribution companies proposed to reduce the transition costs for Cambridge Electric and Commonwealth Electric, by an amount equal to the increase in the respective distribution charges.

Prior to conducting evidentiary hearings, the department issued an interlocutory order stating that "this proceeding does not include a relitigation of the [d]epartment's policy on the recovery of merger-related costs, including the recovery of a merger-related acquisition premium." That policy, simply put,

---

[10]Section 37 of St. 1997, c. 164, required that rates charged by an "electric company" organized under the Act include certain charges relating to energy efficiency or conservation, the demand-side management charge (DSM charge), see G. L. c. 25, § 19, and relating to the promotion of renewable energy, the renewable energy charge (RE charge), see G. L. c. 25, § 20. In *Shea* v. *Boston Edison Co.*, 431 Mass. 251, 253 (2000), we examined those charges in detail and rejected constitutional challenges to them.

favors mergers and acquisitions of utility companies within its jurisdiction, and permits the recovery of merger-related costs, where consolidation and recovery of costs will serve the "public interest," and is set forth in D.P.U. 93-167-A (1994) (*Mergers & Acquisitions*).

In *Mergers & Acquisitions,* the department established guidelines and standards for mergers and acquisitions, and for the recovery of related costs. *Id.* at 1, 6-9, 18-19. The department recognized the significant changes occurring in the utility industry at the State and Federal levels, noting that "[i]n an increasingly competitive market, mergers or acquisitions may represent one of many measures that could achieve savings, efficiencies, increased reliability, and better quality of service for Massachusetts utilities." *Id.* at 5. The department stated its expectation that all utilities "explore thoroughly all cost-savings measures and potential opportunities [including some form of consolidation] to achieve efficiencies of all kinds." *Id.*

The department noted that the standard for judging merger or acquisition proposals is set forth in G. L. c. 164, § 96, and requires the department to determine that the transaction is consistent with the "public interest."[11] *Id.* at 6. The "public interest" standard requires "a balancing of the costs and countervailing benefits attendant on any proposed merger or acquisition."[12] *Id.* The inquiry is case specific and involves an analysis of many factors. *Id.* at 7-9.

---

[11]General Laws c. 164, § 96, provides in pertinent part: "Companies subject to this chapter may . . . consolidate or merge with one another . . . provided . . . that the department, after notice and a public hearing, has determined that such purchase and sale or consolidation or merger, and the terms thereof, are consistent with the public interest." The amendments made to § 96 following the department's order in D.P.U. 93-167-A, at 1, 6-9, 18-19 (1994) (*Mergers & Acquisitions*), made no alterations to this language and have no significance in this case. See St. 1997, c. 164, §§ 242, 243.

[12]The department explained the "public interest" standard under § 96 in *Boston Edison Co.,* D.P.U. 850, at 7-8 (1983), as follows:

> "[E]ven if a particular proposal has negative aspects, we will find that such a proposal is consistent with the public interest if, upon consideration of all its significant aspects viewed as a whole, the public interest is at least as well served by approval of the proposal as by its denial."

With respect to the recovery of acquisition premiums, the department recognized that acquisition premiums "represent a cost or disadvantage to the ratepaying public. The theoretical basis, however, for allowing a premium is that a transaction otherwise in the public interest would not occur, absent premium allowance, and further that the costs or disadvantages represented by the premium are warranted by the benefits thereby captured." *Id.* at 6-7. The department therefore reversed its previous policy of per se disallowance of recovering an acquisition premium, stating that its recovery "will henceforth be judged on a case-by-case basis," and pursuant to the § 96 "public interest" standard. *Id.* at 7. The department explained, "[i]f it can be demonstrated that denying recovery of an acquisition premium prevents consummation of a particular merger that would otherwise serve the public interest, then we may be willing to allow recovery of an acquisition premium." *Id.* at 18. The department emphasized, however, that it would "not automatically allow recovery of all premiums associated with each and every merger." *Id.* Recovery would be considered on a case-by-case basis, as would "the appropriate level" of an acquisition premium. *Id.* at 19.

The department held public hearings concerning the distribution companies' proposed rate plan, and conducted ten days of evidentiary hearings at which over 400 exhibits were introduced. The department ultimately entered a 109-page decision and order approving the rate plan.

In its order, the department first addressed the appropriate standard of review. Because the department had no jurisdiction over the merging parent companies, it acknowledged that the merger fell outside the scope of § 96. The department noted, however, that its approval of the rate plan was essential to the merger, and that the merger would have an impact on ratepayers similar to the impact resulting from mergers within its jurisdiction because the acquisition premium would be "pushed down" to the distribution companies and because the distribution companies were seeking to recover that cost as well as other merger-related costs. Consequently, the department characterized the circumstances as raising an issue of first impression and requiring "some degree of adaptation of our standard of review." The department concluded that adaptation was war-

ranted because "the public interest standard underlies both [§§] 94 and 96." The department also noted that "[w]here statutes of general application allow a broad range of regulatory discretion but do not speak in particularized terms to an instant case" it has the discretion to decide what standard to apply. Thus, the department rejected the argument that it should investigate the "propriety" of the rate plan under § 94 to determine if rates were "just and reasonable,"[13] and concluded that the "public interest" standard in § 96 was the appropriate standard to apply. The department characterized this standard as a "no net harm" standard requiring the department to find that "the public interest would be at least as well served by approval of a proposal as by its denial."[14] To satisfy this standard, the department stated that "costs or disadvantages of a proposed merger must be accompanied by offsetting benefits that warrant their allowance."

Regarding the proposed rate plan, the department approved of the distribution companies' proposed base rate freeze (subject to certain exogenous cost adjustments not relevant here[15]), concluding that the "ratepayers would be at least as well off with the proposed base rate freeze as they would be absent the proposed

---

[13]Section 94 provides, in pertinent part:

"Whenever the department receives notice of any changes proposed to be made in any schedule filed under this chapter which represent a general increase in rates, prices and charges for gas or electric service, it shall notify the attorney general of the same forthwith, and shall thereafter hold a public hearing and make an investigation as to the propriety of such proposed changes . . . ."

In determining the "propriety" of rates, the department must find that they are "just and reasonable." See *Attorney Gen. v. Department of Pub. Utils.*, 392 Mass. 262, 265 (1984); *Incentive Regulations for Elec. & Gas Cos.*, D.P.U. 94-158, at 42 (1995).

[14]As when evaluating a proposed merger, the department may consider various factors in determining whether the "public interest" standard has been satisfied, including: "(1) effect on rates; (2) effect on the quality of service; (3) resulting net savings; (4) effect on competition; (5) financial integrity of the post-merger entity; (6) fairness of the distribution of resulting benefits between shareholders and ratepayers; (7) societal costs; (8) effect on economic development; and (9) alternatives to the merger or acquisition." See *Mergers & Acquisitions*, D.P.U. 93-167-A, at 7-9 (1994).

[15]The department defines "exogenous costs" as positive or negative cost changes beyond a company's control that would significantly affect the company's operations.

merger." The department noted that the current distribution rates previously had been approved by the department as just and reasonable pursuant to § 94, that there was no evidence demonstrating that those rates were not currently just and reasonable, that a traditional rate case demonstration pursuant to § 94 was not required because the distribution companies were not seeking "a general increase in rates" under § 94, and that it was "probable" that results under a § 94 investigation, if conducted, would warrant an increase in the present base rates. The department also pointed out that, because the rate freeze did not include an adjustment for inflation, the freeze constituted a "real" rate decrease for customers over the four-year period. Further, the department stated that there was nothing restricting the rights of the Attorney General, or any other party, to seek a review of rates pursuant to G. L. c. 164, § 93.[16] The department added that, if it had any reason to believe that any one of the distribution companies' earnings were excessive, it would commence an investigation of that company's rates pursuant to § 93.

With respect to the proposed correction to Cambridge Electric's and Commonwealth Electric's distribution rates, the department found that these companies had made an inadvertent mistake in collecting distribution revenue. The department further determined that, if no adjustment were made, the companies would undercollect distribution revenue by approximately $49.8 million. The department concluded that "[u]ndercollecting the revenue requirement is inequitable for Cambridge Electric and [Commonwealth Electric] because it does not allow them a fair opportunity to earn their allowed rates of return," and therefore allowed the proposed adjustments to distribution rates.

Turning to merger-related costs, the department allowed the distribution companies to amortize the merger costs, including

---

[16]General Laws c. 164, § 93, provides that "[o]n written complaint of the attorney general . . . as to the quality or price of the gas or electricity sold and delivered, the department shall notify said company . . . and shall thereupon, after notice, give a public hearing to such complainant and said company, and after such hearing may order any reduction or change in the price or prices of gas or electricity . . . . Such an order may likewise be made by the department, after notice and hearing as aforesaid, upon its own motion."

the acquisition premium, and to recover those costs in future rate proceedings based on current savings estimates. The department referred to its responsibility to evaluate "both the margin between projected merger-related costs and savings (i.e., a margin of error in projections) and the quality of evidence supporting those projections." It also explained that "the quality of projections can be judged in terms of whether they are substantiated by past experience, and supported by logical reasoning founded on sound theory." After reviewing the estimated savings and making certain reductions in the projected amounts, the department found that the projected merger-related savings would amount to $632.5 million during the ten-year period following the merger. The department identified the merger-related costs during that same period as $135 million in after-tax transaction and system integration costs, and $205.7 million in acquisition premium amortizations, for a total of $340.7 million in costs. Thus, the department determined that the benefits of the merger exceeded the cost by $291.8 million, which "goes well beyond meeting the [d]epartment's 'no net harm' standard to the point of actually providing net benefits to customers." The department concluded: "Even if the merger does not produce the level of net savings anticipated by [the distribution companies], the magnitude of the difference between the approximately $632.5 million in savings and $340.7 million in costs supports the conclusion that significant savings to ratepayers will likely result from the merger."

The department then compared the merger-related savings during the initial ten-year period to the merger-related costs during the forty-year period after consummation of the merger. The department calculated the net present value of annual amortization of the acquisition premium during the thirty years following the initial ten-year period to be approximately $179 million. The sum of that amount ($179 million), and the amount of merger-related costs during the initial ten-year period ($340.7 million), represents total costs of the merger of $519.7 million, which the department noted was "considerably less than the merger-related savings of $632.5 million." Thus, the department concluded that "the merger will produce significant benefits for ratepayers" and allowed the merger-related costs to be included

in the cost of any future rate proceeding. To verify that merger-related savings achieved during the rate freeze would continue beyond that period, the department required the distribution companies to file, not later than ninety days after the end of the rate freeze, a "thorough and well-documented report" of cost-saving measures taken and results achieved during the rate freeze.

1. The applicable standard of review of petitions under G. L. c. 25, § 5, was explained in *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997):

> "Our standard of review . . . is well settled: a petition that raises no constitutional questions requires us to review the department's finding to determine only whether there is an error of law. . . . The burden of proof is on the appealing party to show that the order appealed from is invalid, and we have observed that this burden is heavy. . . . Moreover, we give deference to the department's expertise and experience in areas where the Legislature has delegated to it decision-making authority, pursuant to G. L. c. 30A, § 14. We shall uphold an agency's decision unless it is based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14 (7). Moreover, we have acknowledged that the department has broad authority to determine ratemaking matters in the public interest." (Citations omitted.)

In addition, "as we have said and ruled in a variety of contexts, questions of policy are for an administrative agency." *Attorney Gen.* v. *Department of Pub. Utils.*, 390 Mass. 208, 228 (1983), and cases cited. See *Massachusetts Oilheat Council* v. *Department of Pub. Utils.*, 418 Mass. 798, 805 (1994) ("it would not be appropriate for this court to substitute its judgment for a judgment of the department regarding energy policy that cannot be said to be irrational").

2. The plaintiffs argue that the rate freeze and allowance of merger-related costs should not have been permitted by the department in the absence of an investigation, pursuant to § 94,

into the "propriety" of the rate plan to determine if the rates were "just and reasonable." They maintain that the Legislature "assigned two different standards of review for two conceptually distinct activities: rate setting and merger approval." They argue that the department's decision to apply the "public interest" standard for merger approvals pursuant to § 96 in this case was arbitrary, was erroneous, renders the "propriety" standard in § 94 a nullity, improperly revives a valuation practice known as the "fair value" method, and violates the Legislature's intent. We disagree with these contentions.

The review sought by the plaintiffs is used by the department in investigating a gas or electric company's request for approval of a *general increase* in rates pursuant to § 94. As previously noted, § 94 imposes certain procedural requirements on the department when a gas or electric company makes such a request, including the requirements of (1) notifying the Attorney General; (2) conducting a public hearing; and (3) investigating the "propriety" of the proposed rates. These procedural requirements are not implicated in this case because, as recognized by the department, the distribution companies' rate plan sought only an adjustment in certain rates (as discussed below in Part 3) and a rate freeze, not a "general increase in rates." The department did not err by failing to investigate the "propriety" of the rates.

The department's decision to apply the "public interest" standard in § 96 was proper. The "public interest" standard constitutes an overriding consideration in the department's regulatory and ratemaking scheme. See *Boston Real Estate Bd. v. Department of Pub. Utils.*, 334 Mass. 477, 495 (1956) ("The controlling consideration of the public interest in the exercise of the department's statutory regulating power is implicit throughout the statute. It is the standard which supports the grant of power over rates and regulations in general, and it is not necessary to specify further"). See also *Wolf* v. *Department of Pub. Utils.*, 407 Mass. 363, 369 (1990) ("the mission of the agency is to regulate in the public interest"). The department realized it could not directly apply § 96, because it had no jurisdiction over the parent companies and was not approving the merger. The department, however, astutely recognized the

effects of the merger to both the distribution companies, which sought recovery of merger-related expenses, and to customers, who would potentially receive the benefits of savings from the merger in the form of lower rates. Except for a lack of jurisdiction over the merging parent companies, the matter was one that would have been reviewed by the department pursuant to the "public interest" standard of § 96. Because neither § 94 nor any other section of G. L. c. 164 directly dealt with the circumstances presented,[17] the department possessed discretion to settle on an appropriate standard. See *Wolf* v. *Department of Pub. Utils.*, *supra* at 370. The department's application of the "public interest" standard in § 96 was hardly unreasonable considering what the plan essentially proposed, a rate freeze and the recovery of merger-related costs in connection with a merger, objectives traditionally evaluated under the "public interest" standard in § 96. See, e.g., *Eastern-Colonial Acquisition*, D.T.E. 98-128, at 7-8, 89, 92, 96, 105-106 (1999); *NIPSCO-Bay State Acquisition*, D.T.E. 98-31, at 6-8, 33, 44, 66-67 (1998); *Eastern-Essex Acquisition*, D.T.E., 98-27, at 1-7, 68, 69, 76 (1998). See also *Mergers & Acquisitions*, *supra* at 7-9. Further, application of the "public interest" standard was consistent with the department's policy favoring "some form of consolidation," in order to "achieve savings, efficiencies, increased reliability, and better quality of service for Massachusetts utilities," even though that form of consolidation did not fall under its jurisdiction. *Id.* at 5. We shall not evaluate the rational policy determinations expressed therein. See *Attorney Gen.* v. *Department of Pub. Utils.*, *supra* at 228.

The case of *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 333 Mass. 536 (1956), does not require a different conclusion. In that case, Cambridge Electric Light Company sought a determination from the court that, in a ratesetting proceeding under § 94, the department should be bound to apply its determination of the company's stock price from a previous stock issuance decision under G. L. c. 164, § 18. *Id.* at 538. The court disagreed, stating that different considerations underlie

---

[17]It is not of any significance that § 94 also expressly applies a "public interest" standard in reviewing "special contract[s]" for the sale or distribution of gas or electricity.

the two different statutory duties that the department was required to perform: (1) the duty under § 18 to "prevent the issue of stock at a price 'so low as to be inconsistent with the public interest' "; and (2) the duty under § 94 to deem a fair rate of return in setting rates. *Id.* at 538, 539. The court stated that the "department cannot by the manner in which it performs one of these duties disable itself from later performing the other according to law," and that the two statutory duties did "not follow parallel lines." *Id.* The court concluded that the department was not bound to the stock price in a § 18 proceeding in determining rates under § 94. *Id.* In this case, the department did not "disable" itself from performing a statutory duty, particularly the duty to investigate the "propriety" of the rate plan pursuant to § 94, because, as previously explained, the distribution companies never sought "a general increase in rates" that could trigger an investigation under § 94 into the "propriety" of the rate plan.

Finally, we do not consider the Attorney General's argument that the department improperly revived a ratemaking practice known as the "fair value" method, because the Attorney General failed to raise the contention before the department. The argument is not properly before us. *Hingham* v. *Department of Telecom. & Energy*, 433 Mass. 198, 215 (2001).

3. We conclude that the adjustment in distribution rates for Cambridge Electric and Commonwealth Electric, while fully offset by decreases in their respective transition charges, does not represent "a general increase in rates" under § 94, thereby requiring a rate investigation. The adjustment, as noted by the department, simply allowed the two companies to collect the distribution rates that had been permitted in their restructuring plans. Those adjustments did not permit the companies to increase rates to recover increased costs of service. Because the adjustment leaves the Act-mandated DSM charge unchanged, we reject the argument of TEC and Harvard that the companies are "double collect[ing]" DSM charges. Further, the department acted within its discretion in rejecting, albeit implicitly, evidence proffered that the adjustment was not warranted. Nor did the adjustment represent disfavored single-issue ratemaking. The department did not change rates to account for a cost increase

in relation to a single item expense. As previously stated, the department permitted an adjustment to correct an error to give effect to the removal of pre-Act DSM charges from distribution rates. Finally, because the distribution companies assert that the plaintiffs' claim "that the reduction in transition costs will result in additional transition costs to be recovered in the future [plus associated carrying costs] . . . is unfounded," we reject the appellants' arguments that, in reality, there is no true "offset." Should the distribution companies seek to recover additional transition costs and associated carrying costs in the future, that is, after they have collected the respective distribution shortfalls, a rate investigation pursuant to § 94 should ensue to determine whether recovery of those costs is warranted.

4. In view of our conclusion that the department was not required to investigate the "propriety" of the rate plan pursuant to § 94, we reject TEC and Harvard's various arguments that the department's approval of the rate plan violated requirements of § 94. We similarly reject the Attorney General's arguments that are based on the incorrect premise that a § 94 investigation into the "propriety" of rates was required.

5. The department requires costs and savings allocation "to prevent a utility from subsidizing non-regulated aspects of a utility's business from the regulated side." The Attorney General essentially argues that an allocation system was necessary during the rate freeze. The department considered this argument, and noted that, "[e]ven though [the distribution companies] have shown that estimated aggregate savings from the merger would exceed the expected aggregate merger costs, [it] has no assurance that individual regulated utilities would not be assigned merger-related costs which are not commensurate with savings." The department recognized the need for "an established formula that designates proper allocators of costs among all subsidiaries." However, the department realized that the "complexity of the two corporate structures to be merged and the uncertainty regarding the final structure of the post-merger entity" "require[d] the [distribution companies] to gain sufficient experience with regard to the integration of operations and the appropriate allocation of cost responsibility among the subsidiaries." Thus, the department required the distribution

companies to develop a cost allocation system consistent with department precedent, and ordered them to submit their allocation method on the earlier of two events, either within ninety days following the end of the rate freeze or upon the filing of a petition for rate relief pursuant to § 94. We conclude that the department's treatment of costs and savings allocation constituted a permissible exercise of its discretion. See *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 872-873 n.39 (1997). In addition, the allocation of net savings would not have any effect on rates during the four-year rate freeze.

6. The plaintiffs challenge the department's findings that the rate plan serves the "public interest." First, as to the adjustment approved for Cambridge Electric's and Commonwealth Electric's distribution rates, we reject the contention (for the reasons explained in our discussion of the department's approval of the adjustment) that "net harm" results to customers from the adjustment. We reiterate that this adjustment did not constitute a request for a "general increase in rates" under § 94.

We similarly reject the argument that "net harm" results to customers as a result of the rate freeze. This argument is based on the contention that the distribution companies will achieve savings during the four-year rate freeze, but will not pass on those savings to customers in the form of lower rates, and that "there was a complete lack of fairness . . . between shareholders and ratepayers [customers]" in the distribution of merger-related benefits or savings. These contentions (1) rest on an improper comparison between the rates in effect during the *four-year* rate freeze following the merger and the projected savings in the amount of $632.5 million during the *ten years* following the merger; and ignore (2) the significant difference between merger-related savings and merger-related costs during that period (with savings exceeding costs by $291.8 million); (3) the risks borne by the distribution companies during the four-year rate freeze to achieve savings; (4) the fact that in the absence of the rate freeze, rates would likely increase, even if only to account for inflation; (5) the fact that the department would be monitoring cost-saving measures and results during

the four-year rate freeze; (6) the fact that the department stated that if it had any reason to believe that earnings are excessive, it would investigate rates pursuant to § 93; and (7) the evidence that customers will receive approximately eighty per cent of net merger-related savings following the four-year rate freeze and during the term of the acquisition premium recovery and, thereafter, will fully enjoy the benefits of merger-related savings. The department could balance these factors and conclude, in the exercise of its discretion, that the combination of the rate freeze together with merger-related savings would not necessarily produce excessive earnings during the rate freeze and would not, in the distribution of costs and savings, result in a "net harm" to customers; thus, the department properly permitted the rate plan in the exercise of its considerable discretion. Further, as to the distribution of merger-related savings, we are not bound by regulatory actions taken in other jurisdictions. See *Seagram Distillers Co.* v. *Alcoholic Beverages Control Comm'n*, 401 Mass. 713, 718 (1988). We also reject TEC and Harvard's conclusory assertion that the department's approval of the rate freeze was unsupported by "substantial evidence." That assertion expressly relies on an incorrect premise, namely, that the evidentiary record must support "a conclusion that the rate freeze would produce just and reasonable rates." We cannot say on this record that the plaintiffs have met their "heavy burden" of establishing that the department's approval of the rate plan was unsupported by substantial evidence. See *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, *supra* at 867.

7. The cases are remanded to the county court where a judgment is to be entered affirming the decision and order of the department.

*So ordered.*