BAY STATE GAS COMPANY vs. DEPARTMENT OF PUBLIC
UTILITIES.

Suffolk. February 8, 2011. - May 31, 2011.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Gas Company. Department of Public Utilities. Public Utilities,* Rate setting.
*Administrative Law,* Judicial review, Substantial evidence. *Estoppel. Col-
lateral Estoppel. Judicial Estoppel.*

The Department of Public Utilities (department) did not err in denying a gas
company's request, in a petition for a general increase in natural gas distribu-
tion rates, for recovery of costs previously offset by revenues from a subsidiary
that the gas company had earlier divested, where, in a proceeding on that
divestiture, the department had expressly left open the appropriate ratemak-
ing treatment to be afforded the operational cost impacts associated with the
sale of the subsidiary; where substantial evidence supported the department's
conclusion that the gas company could achieve further cost savings beyond
those identified by the gas company's consultant; where the department's at-
tention to the timing of the general rate increase filing was neither an error
of law nor arbitrary or capricious; and where the department was not col-
laterally estopped from holding the gas company's ratepayers harmless from
the effect of the sale of the subsidiary. [813-818]

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on November 19, 2009.

The case was reported by *Spina,* J.

*Robert J. Keegan (Cheryl M. Kimball* with him) for the
plaintiff.

*David A. Guberman,* Assistant Attorney General, for the
defendant.

BOTSFORD, J. Five months after the Department of Public
Utilities (department) approved the request of Bay State Gas
Company (Bay State or the company) to sell and transfer all
the common stock of its subsidiary Northern Utilities, Inc.
(Northern), Bay State filed a petition for a general increase in
its natural gas distribution rates. In that rate increase filing, Bay
State sought to recover from its customers approximately $1.96

million in costs previously offset by revenues from its subsidiary Northern. Focusing on Bay State's position during the earlier stock sale and transfer proceeding that the divestiture of its subsidiary would not have an impact on its customer rates in the near future, the department denied that request while allowing Bay State a general rate increase of $19 million. Bay State has appealed from the department's decision. We affirm.

1. *Background.* We outline the relevant facts based on the department's findings in the proceeding now before us, D.P.U. 09-30 (2009) (D.P.U. 09-30), supplemented by the department's findings in its earlier investigation into Bay State's stock sale and transfer request, D.P.U. 08-43-A (2008) (D.P.U. 08-43-A), and other relevant materials as indicated. Bay State, a Massachusetts public utility, provides retail gas distribution services to approximately 285,000 residential, commercial, and industrial customers in its three noncontiguous operating districts of Springfield, Brockton, and Lawrence. The company is a subsidiary of Ni-Source Inc. (NiSource), an energy holding company headquartered in Indiana. On November 30, 2005, the department approved the implementation of a performance based regulation (PBR) plan[1] for Bay State. See Bay State Gas Co., D.T.E. 05-27 (2005). Bay State's PBR plan involved "cast-off" distribution rates based on cost of service/rate of return (COS/ROR) ratemaking principles,[2] thereafter adjusted annually by a "price cap" formula for the life of the plan. See generally *MCI Telecomm. Corp.* v. *Department of Telecomm. & Energy,* 435 Mass. 144, 147 (2001). The price cap formula set the conditions for annual changes to account for general inflation but allowed for an offset to the inflation-based increase based on presumed productivity gains; adjustments also

---

[1]Performance based regulation (PBR) plans are structured to change base rates on an annual basis in accordance with a pricing formula approved in advance and designed to operate over a set number of years. See *Southern Union Co.* v. *Department of Pub. Utils.,* 458 Mass. 812, 816 n.8 (2011).

[2]Under the "cost of service/rate of return" (COS/ROR) ratemaking model, a utility can recover a "reasonable return" on any "reasonable operating expenses," and these two figures are combined to establish the utility's "total revenue requirement." *Boston Gas Co.* v. *Department of Telecomm. & Energy,* 436 Mass. 233, 234 (2002). The base rates for the utility are set to permit recovery of this total revenue requirement, are determined periodically in general rate proceedings before the department under G. L. c. 164, § 94, and remain the same until the next general rate proceeding. See *id.* at 234-235.

were possible under an earnings sharing mechanism (ESM)[3] that was part of the PBR plan. The cap applied, although in a somewhat different manner, both to Bay State's aggregate rate-based revenue and to rate components applicable to classes of customers. The company's approved PBR plan was to operate for ten years, or until 2016.

Until December, 2008, Bay State owned all the stock of Northern, a New Hampshire corporation serving approximately 52,000 customers in New Hampshire and Maine. Northern was treated as a "below-the-line" asset of the company.[4] Bay State provided certain services to Northern, such as call center functions, accounting functions, field personnel workload coordination, and credit and collection activities. Similarly, Northern's sales staff assisted Bay State's sales function. The company and Northern charged each other for the services rendered pursuant to the terms of one or more operational service agreements between the entities; the net effect on an annual basis was a flow of $2,710,387 in revenue from Northern to Bay State in exchange for services.

At some point before November, 2008, Bay State decided to sell Northern after determining that Northern's operations required additional support services. Additionally, Bay State determined that Northern was underperforming from a rate of return perspective, and that this underperformance had a negative effect on the company's ability to attract capital. Accordingly, Bay State sought the approval of the department for the sale of Northern to Unitil Corporation (Unitil), pursuant to G. L. c. 164, § 96 (§ 96).[5] In the proceeding that followed (§ 96 Northern proceeding), the department evaluated the pro-

---

[3] The earnings sharing mechanism (ESM) buffered Bay State Gas Company (company) shareholders from the full effects of unexpectedly high or low earnings; outside a "deadband" of 400 basis points above or below the company's authorized return on equity of ten per cent, twenty-five per cent of any loss or gain would be paid by or returned to ratepayers. See *Southern Union Co.* v. *Department of Pub. Utils.*, 458 Mass. at 820-826 (explaining mechanics of ESM in Southern Union Company's rate settlement agreement).

[4] The revenues and expenses of below-the-line assets such as Northern Utilities, Inc. (Northern), are not considered for ratemaking purposes. See, e.g., Bay State Gas Co., D.T.E. 05-27 at 60-61 (2005) (summarizing ratemaking treatment of Bay State's service businesses as of 2005).

[5] The department reviews certain types of corporate transactions of regulated

posed sale and transfer based on the potential impact on Bay State's customer rates, among other factors. See D.P.U. 08-43-A at 21. The Attorney General intervened as of right in the § 96 Northern proceeding, see G. L. c. 12, § 11E, and opposed the proposed sale in the absence of a rate mechanism to hold Bay State customers harmless once costs of administrative functions were spread over fewer customers. D.P.U. 08-43-A at 30-32.

On November 18, 2008, after its review, the department approved the sale of Northern to Unitil.[6] In its decision, the department stated that in reviewing the sale it employed the "no net harm" test.[7] *Id.* at 25-26. It noted the Attorney General's argument that the company could expect to incur $5.5 million in stranded costs for management and back-office services previously funded by Northern ratepayers, and that the department should address the potential impact of these additional costs on Massachusetts ratepayers in the § 96 Northern proceeding itself. *Id.* at 30-33. However, the department also noted the

utility companies, including sales of subsidiary companies, pursuant to G. L. c. 164, § 96 (§ 96). Section 96 provides in relevant part:

> "Companies . . . subject to this chapter and their holding companies may . . . sell and convey their properties to another of such companies or to a wholesale generation company and such other company may purchase such properties if [shareholders approve and] the department, after notice and a public hearing, has determined that such purchase and sale . . . and the terms thereof, are consistent with the public interest; provided, however, that in making such a determination the department shall at a minimum consider: proposed rate changes, if any; the long term strategies that will assure a reliable, cost effective energy delivery system; any anticipated interruptions in service; or other factors which may negatively impact customer service . . . ."

[6]The sale closed on December 1, 2008.

[7]In a § 96 proceeding, the department determines whether the "no net harm" standard is met in terms of whether "the public interest would be at least as well served by approval of a proposal as by its denial." *Attorney Gen. v. Department of Telecomm. & Energy*, 438 Mass. 256, 264 (2002). See § 96. The department assesses the "public interest" by considering various factors, including "(1) effect on rates; (2) effect on the quality of service; (3) resulting net savings; (4) effect on competition; (5) financial integrity of the post-merger entity; (6) fairness of the distribution of resulting benefits between shareholders and ratepayers; (7) societal costs; (8) effect on economic development; and (9) alternatives to the merger or acquisition." *Attorney Gen.* v. *Department of Telecomm. & Energy, supra* at 264 n.14, quoting Mergers & Acquisitions, D.P.U. 93-167-A at 7-9 (1994).

company's contention that it proposed no rate changes as a result of the proposed stock sale; that even costs at the "absolute upper end" amount of $5.14 million annually would represent only one per cent of the company's annual revenues, a cost variance the company considered to be "insignificant," *id.* at 33-34; and that in any event, because of Bay State's PBR plan, the effect of Northern's sale would not be a factor in rates prior to 2011.[8] *Id.* at 35.

The department agreed with the company that the Attorney General's effort to quantify the impact of the proposed stock sale on Bay State's cost structure was premature where "Bay State's distribution rates are not presently affected by the sale of Northern." *Id.* at 39, 40. Nevertheless, it "recognize[d] the Attorney General's concern regarding the potential economic harm to Bay State's customers" and directed the company "to address any measures to mitigate the potential increase in its overhead expenses in its next base rate proceeding." *Id.* at 40. Accordingly, in approving the sale, the department delayed until the expiration of Bay State's PBR plan a determination "whether there are any potential cost impacts" associated with the sale and, if so, the "appropriate ratemaking treatment." *Id.* at 38-39.[9]

On April 16, 2009, Bay State filed under G. L. c. 164, § 94

[8]Within the terms of its PBR plan, Bay State had the right to file annually for rate adjustments according to the price cap index and the ESM. See notes 1 and 3, *supra.* The first full year after the sale of Northern was 2009, for which financial data would have been submitted in 2010, with a potential impact on rates through the ESM in 2011. See D.P.U. 08-43-A at 35. Within the PBR plan, therefore, if over-all poor earnings triggered the ESM, a share of stranded costs could have been passed on to ratepayers in 2011, but not before. See note 3, *supra.*

[9]In its Northern decision, the department relied heavily on Bay State's arguments. The company's briefs in the § 96 Northern proceeding stated that the department need not consider the impact of the sale of Northern on rates at that time because "any potential, direct or indirect impacts on Bay State [of the termination of the Northern service agreements] . . . may be reviewed by the Department and adequately addressed, [including] in the next general rate proceeding." The company explained that ratepayers were shielded from immediate rate consequences because under the PBR plan, the loss of Northern revenue could not impact rates until 2011 at the earliest. "In the short term," the company argued, "Bay State has warranted it will mitigate the loss of Northern's shared services and will prudently realign its resources to meet its needs."

(§ 94),[10] its petition for a general increase in gas distribution rates (§ 94 rate proceeding). The company explained that its filing was motivated by two factors. First, the department had issued a directive for all distribution companies to be operating under decoupling[11] plans by year-end 2012, with a preference for implementing decoupling mechanisms through a base rate proceeding. Because the company's PBR plan extended through November, 2016, the company believed it necessary to prepare a petition for § 94 base rate review in order to comply with the decoupling time frame. Second, the company faced an operating deficiency of $34.2 million caused, in the company's view, by factors including long-term inflationary pressures, unrecovered capital costs, adverse capital market conditions, and declining customer usage not anticipated when rates were set in 2005. The Attorney General intervened on April 24, 2009,[12] and represents the department in this appeal. G. L. c. 12, § 3.

After hearings in May and July, 2009, the department concluded that Bay State had the statutory right to seek rate relief, see § 94, but that establishment of new base rates subjected the company's PBR plan to termination because resetting base rates "completely changes the dynamic" of the rate plan from a customer's perspective. In the absence of a proposal from Bay State for a new PBR plan, the department employed a rate-making approach akin to a COS/ROR model, with revenue decoupling provisions but without automatic annual base rate adjustments. It considered and rejected Bay State's claim that

---

[10]General Laws c. 164, § 94, provides in pertinent part:

> "Whenever the department receives notice of any changes proposed to be made in any schedule filed under this chapter which represent a general increase in rates, prices and charges for gas or electric service, it shall notify the attorney general of the same forthwith, and shall thereafter hold a public hearing and make an investigation as to the propriety of such proposed changes . . . ."

[11]Decoupling, which is not directly at issue in this appeal, refers to a methodology for rate setting that unties a utility's revenue recovery from ratepayer consumption, with the goal of aligning the financial incentives of utilities with energy conservation efforts. See Investigation into Rate Structures That Will Promote the Efficient Deployment of Demand Resources, D.P.U. 07-50-A (2008); St. 2008, c. 169, An Act Relative to Green Communities.

[12]The department also granted intervener status or limited participant status to other entities; none is a party to the appeal.

$1,960,065 in costs previously offset by revenue from Northern should be built into test-year cost of service.[13] This figure, $1,960,065, represented the net value of adjustments Bay State argued were required in order to account for the elimination of Northern's contributions to shared services, after accounting for cost reductions Bay State's consultants, Concentric Energy Advisors (Concentric), estimated the company could achieve through service realignment.[14] Bay State filed a timely appeal pursuant to G. L. c. 25, § 5, in the county court, requesting that the department's decision be set aside and the company be authorized to recover an additional $1,960,065 annually in net operating costs.[15] A single justice reserved and reported the case to the full court.

2. *Discussion.* Where a party seeks judicial review of the department's decision pursuant to G. L. c. 25, § 5:

> "Our standard of review . . . is well settled: a petition that raises no constitutional questions requires us to review the department's finding to determine only whether there is an error of law. . . . The burden of proof is on the appealing party to show that the order appealed from is invalid, and we have observed that this burden is heavy. . . . Moreover, we give deference to the department's expertise and experience in areas where the Legis-

[13]The "test year" is the year in which financial data are measured for the purpose of projecting a utility's future revenue needs. See *Boston Edison Co. v. Department of Pub. Utils.*, 375 Mass. 1, 24 (1978). The test year used in this case was 2008. Because the sale of Northern closed on December 1, 2008, for eleven months of the test year, there was a net flow of revenue from Northern to Bay State. As explained in the text immediately below, Bay State takes the position that to create an accurate view of its financial picture going forward, it was necessary for the department to approve offsetting adjustments to actual test-year costs.

[14]Bay State's proposed adjustments assumed that projected net revenue losses of $2,710,387 resulting from the Northern sale would be partially mitigated by $750,322 in operations and maintenance savings that Concentric Energy Advisors (Concentric) estimated the company could achieve through realignment of services such as the elimination of full-time positions dedicated to providing service to Northern's customers.

[15]In total, the company's petition to the department requested a general increase in gas distribution rates of $34.6 million. Of this amount, the department granted an increase of $19.1 million, but excluded the remaining requested increases in net operating expenses. Only the $1.96 million net adjustments associated with the sale of Northern is before us on appeal.

lature has delegated to it decision-making authority, pursuant to G. L. c. 30A, § 14. We shall uphold an agency's decision unless it is based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14 (7)."

*DSCI Corp.* v. *Department of Telecomm. & Energy*, 449 Mass. 597, 603 (2007), quoting *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997).

Public utilities may "charge rates which are compensatory with the full cost incurred by efficient management, [but] they may not recover costs which are excessive, unwarranted, or incurred in bad faith." *Boston Gas Co.* v. *Department of Pub. Utils.*, 387 Mass. 531, 539 (1982). Whenever a public utility, including a gas distribution company such as Bay State, petitions for a general rate increase, the department must investigate the "propriety" of the proposed changes. G. L. c. 164, § 94. In this context, a utility's revenue needs may be established by the test-year method, whereby the department examines a test period "on the theory that the revenue, expense, and rate base figures during that period accurately reflect the utility's present financial situation and fairly predict [its] future performance." *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 24 (1978). However, "[t]o the extent that known or anticipated changes in revenues, expenses, or [assets] will distort the correlation among these elements, adjustments are made in the test-year data to reflect those changes." *Id.* In determining the "propriety" of rates in a § 94 proceeding, the department must find they are "just and reasonable."[16] *Attorney Gen.* v. *Department of Telecomm. & Energy*, 438 Mass. 256, 264 n.13 (2002).

Bay State argues that the department erred in denying recovery of costs incurred on an annual basis to support functions once shared with Northern such as call center activities, customer bill inquiries, service requests or terminations, data entry, communications, scheduling, and marketing. It points out that there

[16]This standard is distinct from the "no net harm" standard applicable to § 96 proceedings. See *Attorney Gen.* v. *Department of Telecomm. & Energy*, 438 Mass. at 264.

was no evidence presented or other claim made in the § 94 rate proceeding that these costs would not be incurred, that they would not be necessary to service customers, or that they were otherwise unreasonable; rather, the department's decision addressed only who should bear the costs (customers or shareholders). Because under Massachusetts law, Bay State argues, customers bear responsibility for paying for the reasonably and prudently incurred costs of providing utility services, the department erred in denying recovery of these costs without a finding that they were excessive, unwarranted, or incurred in bad faith. Bay State further contends that in any event the department had no discretion to require the company to absorb the impact of the Northern sale on operating costs when the department established no such requirement at the time it approved the Northern sale; any such condition could only have been imposed in the earlier decision on the § 96 Northern proceeding. In effect, the company argues that in the § 94 rate proceeding the department was obliged to assess the propriety of adjustments to test-year costs solely on their own terms, as it was too late to establish any conditions in connection with the sale of Northern.

We affirm the department's decision. As previously indicated, in the § 96 Northern proceeding, the department expressly left open the "appropriate ratemaking treatment" to be afforded the operational cost impacts associated with the sale of Northern. See D.P.U. 08-43-A at 38-39. It was therefore appropriate, in the subsequent § 94 rate proceeding, to address proper treatment of once-shared functions in light of Bay State's assertions during the § 96 Northern proceeding. Consistent with those prior statements by the company, the department could deny costs associated with the loss of Northern's shared services, in Bay State's words, "[i]n the short term . . . ." Put another way, adjustments to test-year revenues and expenses are appropriate only where "anticipated changes . . . will distort the correlation" among revenue, expenses, and assets. *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. at 24. In the context of the § 96 Northern proceeding, Bay State had characterized even a $5.14 million impact from the Northern sale on Bay State's cost structure as an "insignificant" effect that would be mitigated or absorbed until 2011 at the very earliest. See D.P.U. 08-43-A at 34-35. The company's description entitled

the department to conclude, in the § 94 rate proceeding, that the anticipated change would not distort the relationship between revenue, expenses, and assets, and that therefore no adjustment in this respect was necessary in order for the test-year financial data to form a proper foundation for projected revenue recovery needs. See *id.*

Bay State also challenges as unsupported by substantial evidence the department's conclusion that the company could achieve further cost savings beyond those Concentric identified. We disagree. We conclude that from an evidentiary perspective, the department properly relied on testimony by the company (in the § 96 Northern proceeding) that relevant costs were "insignificant" and as such could be entirely mitigated or absorbed.

Similarly, we disagree with the company's position that the department's attention to the timing of the general rate increase filing was an error of law and arbitrary and capricious. The timing of the filing was made directly relevant by the company's argument in the § 96 Northern proceeding.[17] Where the department reasonably expected, based on Bay State's assertions in that proceeding, that the company would work to mitigate stranded costs over several years before asking that customers absorb any remaining costs, the department could properly conclude that, "less than one year" later, it was "inequitable" to require ratepayers to bear the burden of Northern-related overhead "at this time." The department's conclusion is entirely consistent with the company's position in the § 96 Northern proceeding.

The department apparently attempted in the § 96 Northern

---

[17]Bay State contests the reasonableness of the department's belief that it anticipated no general base rate filing by the company at the time it approved the Northern sale. Bay State points to a letter dated August 28, 2008, in which, it now argues, the company informed the department that it expected to file a base rate case during the second quarter of 2009. The letter does not support the company's position. In it, Bay State's president informs the department that "if the decision is made to file a rate case, the Company expects it would file during the second quarter of 2009." In other words, the letter makes only a conditional statement. The department was entitled to rely on Bay State's later and far more direct assessment in its reply brief in the § 96 Northern proceeding on October 17, 2008, that because the company operated under a PBR plan, the impact, if any, of the Northern sale on rates would be "more than 3 years away." See note 8, *supra.* We conclude the department reasonably understood the company to be anticipating no base rate proceeding involving Bay State in the immediate future.

proceeding to give Bay State some leeway on future recovery of reasonable costs previously offset by Northern, after a period of adjustment.[18] The department's approach implicitly concedes that at some future point, perhaps by 2016, it would be appropriate for Bay State to recover reasonably and prudently incurred administrative costs once covered by Northern to the extent that the company was not able to mitigate them. However, this flexibility expressed by the department in the § 96 Northern proceeding is something very different from a grant of permission to transfer the negative impacts of the Northern sale — namely, the increase in servicing costs per customer — to Bay State's ratepaying customers prior to a real attempt or effort by the company to cut those additional costs.[19] Such a result would be at odds with the "no net harm" standard under which the Northern sale was approved.

Finally, Bay State argues that the department is collaterally estopped from holding the company's ratepayers harmless from the effect of the Northern sale when, in the § 96 Northern proceeding, the department expressly considered and rejected the Attorney General's argument that it do just that. We do not agree.[20] To the contrary, the related doctrine of judicial estoppel

---

[18]This more flexible treatment contrasts with the department's determination that Unitil's subsidiaries could never pass along costs of the Northern acquisition to customers in Fitchburg. Unitil's subsidiaries serve Massachusetts customers in Fitchburg. See D.P.U. 08-43-A at 36 (2008). The department stated in its decision in the § 96 Northern proceeding: "Unitil has represented repeatedly that Fitchburg's customers will not bear any costs related to the acquisition of Northern . . . . We will hold Unitil to this representation at the time of Fitchburg's next base rate case." *Id.* at 40.

[19]Bay State argues that the department's requirement of appropriate mitigation was met by the Concentric report quantifying potential savings. A report on potential savings does not equate to actual mitigation efforts in a profit-driven environment. Based on our review of the record, Concentric's anticipated cost savings appear to be focused on "low-hanging fruit" — that is, relatively easy cuts achievable through attrition and through the elimination of full-time positions and vendor contracts dedicated entirely to Northern activities, as opposed to the more difficult savings that might be achieved through comprehensive scaling down and reorganization of administrative services, including redesigning positions and reducing physical space needs in light of the smaller customer base that remains after the departure of Northern. At any rate, the department had the discretion to rely on the company's statements that, in the short term, all costs could and would be mitigated or absorbed.

[20]The doctrine of collateral estoppel provides that "[w]hen an issue of fact

precludes the company from denying the department's right to address, in this case, a question reserved at the company's request in the Northern divestiture case.

Judicial estoppel bars a party from asserting a position directly inconsistent with, meaning mutually exclusive of, the position asserted in a prior proceeding where the party convinced the court to accept its prior position. *Commonwealth* v. *DiBenedetto*, 458 Mass. 657, 671 (2011), and cases cited. Here, the company's position that the department cannot lawfully disallow divestiture-related costs is directly inconsistent with the company's statement in the Northern divestiture case that "when the Department declines to exercise authority over a potential rate or service matter in a [§] 96 proceeding, it does not divest itself of [the] ability to review those same issues in a later [§] 94 rate proceeding." The department adopted the company's position in the prior proceeding when it determined it would not impose any particular mechanism to account for stranded costs but could determine appropriate ratemaking treatment following the expiration of the PBR plan. D.P.U. 08-43-A at 38-39. The company may not now argue that by deferring the issue, the department forever lost the ability to consider appropriate ratemaking treatment for costs previously offset by Northern.

3. *Conclusion.* The case is remanded to the county court where a judgment is to be entered affirming the decisions and order of the department.

*So ordered.*

---

or law is actually litigated and *determined by a valid and final judgment,* and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim" (emphasis added). *Alba* v. *Raytheon Co.*, 441 Mass. 836, 841 (2004), quoting *Martin* v. *Ring*, 401 Mass. 59, 61 (1987). In the § 96 Northern proceeding, at Bay State's request, the department deferred the issue of appropriate ratemaking treatment for costs previously borne by Northern. When the company filed its present petition, there was therefore no final judgment on the merits in regard to ratemaking treatment of the disputed costs.