NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12262

ENERGY EXPRESS, INC.[1] vs. DEPARTMENT OF PUBLIC UTILITIES.


Suffolk.     May 4, 2017. - August 3, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, Lowy, Budd, & Cypher, JJ.


Gas Company.  Public Utilities.  Department of Public Utilities.
     Words, "Customer."


Civil action commenced in the Supreme Judicial Court for the county of Suffolk on September 22, 2016.

The case was reported by Lowy, J.


William S. Harwood for the plaintiff.
Kirk G. Hanson, Assistant Attorney General, for the defendant.
Shaela McNulty Collins & Kenneth W. Christman, for Bay State Gas Company, amicus curiae, submitted a brief.


LOWY, J.  Prior to 1999, the supply, transportation, and distribution of natural gas to consumers in the Commonwealth were "bundled" together and provided by a State-endorsed monopoly, referred to as a "local distribution company" or

[1] Doing business as Metromedia Energy, Inc., intervener.

"LDC." The Legislature "unbundled" these components, allowing private companies, referred to as "marketers," to compete as suppliers of natural gas in the Commonwealth. Transportation and distribution of gas, however, remained the sole province of the LDCs. To ensure that consumers who opted to purchase gas from marketers continued to receive a sufficient supply of gas, the Department of Public Utilities (department) required LDCs to assign to marketers a proportional share of the "capacity" along interstate pipelines, based on the needs of the marketers' customers.

Under Federal law, the interstate pipeline companies may be required to issue refunds to companies like LDCs who purchased pipeline capacity. Then, under State law, the LDCs may be required to pass that refund on to its "customers." G. L. c. 164, § 94F. The issue in this case is whether the assignment of capacity by an LDC to a marketer causes the marketer to become a "customer" of the LDC, such that it is entitled to a share of that refund under G. L. c. 164, § 94F. Given the deference we afford the department in interpreting the statutes and regulations for which it is responsible, we accept the department's conclusion that only an end consumer, and not a marketer, is entitled to the refund.

Background. There are three primary components to the natural gas industry: (1) the gas commodity itself; (2)

"upstream capacity," which involves the transmission and storage of gas from the source in pipelines, often across State boundaries; and (3) local distribution of gas to the consumer. Historically, in Massachusetts, the LDC provided all three components. The gas company in this case, Bay State Gas Company (Bay State),[2] is an LDC.

In the 1990s, Massachusetts partially "unbundled" the industry. D.T.E. 98-32-B, at 8, 27-28 (1999) ("Unbundling Order I"). See generally 220 Code Mass. Regs. §§ 14.00 (2008). The department determined, however, that of the three primary components of the gas industry, only the unbundling of the gas commodity itself was feasible.[3] Unbundling Order I at 27-28. The department was concerned that allowing competition for the second component, upstream capacity, "would run the risk that interstate capacity could be diverted to serve markets outside the Commonwealth or other non-traditional customers within the [S]tate market . . . ." Id. at 8. The department did not envision opening the third component, distribution, to competition. See id. at 7-8. Thus, unbundling was limited to

---

[2] Bay State does business in Massachusetts under the name Columbia Gas of Massachusetts.

[3] The department revisited the unbundling of the market in 2005, but again concluded that the circumstances of the natural gas industry in Massachusetts still would not support a competitive market for upstream capacity. D.T.E. 04-1, at 26 (2005).

the sale of the commodity itself.  Id. at 7-8, 27-28.  Consumers could elect to purchase natural gas from marketers, such as the intervener in these proceedings, Energy Express, Inc. (Energy Express), instead of an LDC.

Because the department did not open upstream capacity to private competition, LDCs remain responsible entering into contracts for upstream capacity on the interstate pipelines.  Accordingly, Bay State, as an LDC, must procure sufficient capacity along interstate pipelines based on the gas needs of both customers who continue to purchase the bundled service from them ("sales customers") and those who elect to purchase gas from marketers ("transportation customers").[4]  Thus, even consumers who purchase their gas from Energy Express, a marketer, remain customers of Bay State, an LDC, for purposes of the second and third components of the natural gas industry (i.e., upstream capacity and local distribution).

As a result of the unbundling process, some consumers were now purchasing their gas from one entity (a marketer) and having it transported to them by another (an LDC).  In light of this change, the department had to determine the best way to ensure that those consumers could depend on the reliable delivery of

---

[4] There is a third type of customer, for whom the LDC is not responsible for procuring upstream capacity, referred to as "capacity-exempt" customers.  The supply, transportation, and distribution of gas to these customers has no bearing on this case.

their natural gas. To that end, the department adopted a mandatory "slice-of-system" assignment approach for upstream capacity. Unbundling Order I at 34-35. Under this system, the LDC must secure all of the upstream capacity necessary for both its sales and transportation customers. Id. at 12-13. Then, the LDC proportionally assigns capacity to each marketer, based on the pro rata gas needs of its customers who elect to purchase gas from that marketer. Id. This ensures that there will be sufficient capacity along the interstate pipelines to transport the gas "upstream" from the supply source to consumers. See id. at 34-35.

Pursuant to the LDC's assignment of capacity, a marketer like Energy Express directly pays the proportional costs of capacity to a pipeline, on behalf of its customers, just as an LDC like Bay State does for its sales customers. Id. at 12-13 (marketer "assume[s] the same cost structures with regard to the assigned capacity"). LDCs pass that cost on to their customers in compliance with applicable regulations and its department-approved rates, 220 Code Mass. Regs. § 14.03(4)(c), (d) (2009), while marketers have the ability to freely negotiate the extent to which they pass these costs on to their customers. See 220 Code Mass. Regs. § 14.04 (2008).

The upstream capacity cost is determined by Federal law, through the Federal Energy Regulatory Commission (FERC). FERC

may set maximum rates that pipelines may charge to LDCs for upstream capacity. See 15 U.S.C. § 717d (2012). Sometimes, a pipeline may charge a rate, subject to FERC's review. If FERC subsequently determines that the rate was too high, FERC will order the pipeline to refund the excess payment to the appropriate LDCs. See G. L. c. 164, § 94F; 18 C.F.R. § 154.501(a) (2010). In Massachusetts, the department can then order the LDC to pass on the refund to its customers. G. L. c. 164, § 94F.

That is precisely what happened in this case. The Portland Natural Gas Transmission System (pipeline) was permitted to charge a certain rate, subject to FERC review. Bay State paid that rate to the pipeline. Subsequently, FERC determined that the pipeline had charged too much and ordered the pipeline to issue a refund. Because Bay State was the contracting party with the pipeline, and not the marketers, Bay State received the full refund.

The department ordered Bay State to issue a refund to its sales and transportation customers, which it did. G. L. c. 164, § 94F. Energy Express requested to intervene in the pertinent administrative proceedings and was permitted to do so.[5] Energy

_____

[5] Initially, Bay State planned to issue refunds only its sales customers, and not its transportation customers. As a result of the proceeding in which Energy Express intervened, the department determined that this refund method would

Express argued that it, and not its customers (i.e., Bay State's transportation customers), should receive a proportional share of the refund directly, an amount exceeding $250,000, because Energy Express paid the upstream capacity costs up front.  In a written order,[6] the department rejected Energy Express's position and concluded that neither § 94F nor basic fairness required Bay State to provide a proportional share of the refund to Energy Express.  Energy Express appealed to the county court pursuant to G. L. c. 25, § 5, and a single justice granted Energy Express's unopposed motion to reserve and report the case to the full court.  We affirm.

Standard of review.  When reviewing a decision of the department that does not raise a constitutional question, but is limited to evaluating whether the department committed legal error, "[t]he burden of proof is on the appealing party to show that the order appealed from is invalid, and we have observed that this burden is heavy."  Bay State Gas Co. v. Department of Pub. Utils., 459 Mass. 807, 813 (2011), quoting DSCI Corp. v. Department of Telecomm. & Energy, 449 Mass. 597, 603 (2007).

_____

disproportionately benefit Bay State's sales.  Both parties agree that the refund should not be limited to Bay State's sales customers.

[6] Neither Bay State nor Energy Express requested an evidentiary hearing, but filed briefs and a joint stipulation of facts.

We afford the department deference, based on its "expertise and experience in areas where the Legislature has delegated decision-making authority" to the department. Bay State Gas Co., supra at 813-814, quoting DSCI Corp., supra, and citing G. L. c. 30A, § 14. Accordingly, we uphold the department's decision "unless it is based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary [or] capricious, an abuse of discretion, or otherwise not in accordance with law." Bay State Gas Co., supra at 814, quoting DSCI Corp. supra, and citing G. L. c. 30A, § 14 (7).

Discussion. Energy Express argues that (1) the department committed an error of law and abused its discretion in interpreting "customer" as used in § 94F to exclude marketers; (2) that the department's interpretation violates the Federal "filed rate" doctrine; and (3) the department's interpretation conflicts with its policy to allow the competitive market to determine the most efficient outcome. We address each argument in turn.

1. Interpretation of "customer." General Laws c. 164, § 94F, governs where a gas company, such as Bay State, must refund  excess upstream capacity costs to its "customers." Once Bay State receives the FERC-ordered refund from the pipeline, Section 94F empowers the department to

"order said gas company to refund to its customers any sums refunded to said gas company for the period subsequent to the effective date of the order of the department approving rates for the gas company as above set forth and may impose such restrictions, limitations, terms and conditions in such order as are considered necessary by it . . . ."

In this case, Bay State received a refund from a pipeline, pursuant to FERC's determination that the pipeline had overcharged for upstream capacity. The department then ordered Bay State to pass that refund on to its customers. Energy Express claims that it, as an assignee of Bay State with respect to upstream capacity along the pertinent pipeline, should be interpreted as a "customer" under § 94F. In support of this position, Energy Express argues that the department misinterprets the plain language and legislative history of § 94F; that Energy Express paid, and was ultimately responsible for, the costs associated with upstream capacity and that the department's interpretation imposes an unfair result on Energy Express, while providing its customers a windfall. We disagree.

When interpreting a statute, we ascertain the intent of the Legislature by relying on all of the statute's "words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished" (citation omitted). Meikle v. Nurse, 474 Mass. 207, 210 (2016). Yet, we simultaneously afford deference to the

department's reasonable interpretations of the statutes that it administers. <u>Bay State Gas Co</u>., 459 Mass. at 813-814.

Energy Express claims that it became a "customer" of Bay State for the purposes of § 94F when Bay State assigned Energy Express its proportional share of the upstream capacity. Energy Express argues that the language and purpose of § 94F suggest that the refund should go to the party who actually paid the department-approved rate, which FERC subsequently concluded was excessive. This misconstrues § 94 and mischaracterizes the marketers' role with respect to upstream capacity.

The department interprets "customer," in the context of the natural gas market, to mean an entity that purchases natural gas or related services for its own consumption. The department points out that its regulations define a "retail customer" as one "located in Massachusetts that purchases natural gas for its own consumption and not for resale in whole or in part." 220 Code Mass. Regs. § 14.02 (2008). Although this may not be the only possible definition of customer, it is the one adopted by the department, is reasonable, and is entitled to our deference. <u>Bay State Gas Co</u>., 459 Mass. at 813-814.

The legislative history of § 94F supports interpreting "customer" to mean the entity that consumes the natural gas. In <u>Central States Elec. Co</u>. v. <u>Muscatine</u>, 324 U.S. 138, 140-141 (1945), the United States Supreme Court considered whether a

utility company or the consumers were entitled to a natural gas rate refund. The Court opined that, although the purpose of the Federal Natural Gas Act was "to protect the ultimate consumer at retail," that legislation left to the States the regulation of intrastate distribution and sales. Id. at 144. The refund at issue in that case stemmed from such intrastate activity, and thus the Court concluded that only the State's law could provide the mechanisms by which the refund could reach the consumer. Id. at 144-146. The enactment of § 94F in 1953 -- just eight years after Central States Elec. Co. -- provided such a mechanism. See St. 1953, c. 331. Under § 94F, the department may order an LDC to issue that refund to its intended beneficiaries, who are, according to the Supreme Court, the "ultimate consumer at retail."[7] Central States Elec. Co., supra at 144. Thus, Energy Express does not purchase gas for its own consumption and, therefore, does not qualify as a customer under the department's interpretation, based on the plain language and purpose of § 94F.

Further, we defer to the department's determination that the consumers of natural gas, and not the marketers, are ultimately responsible for the upstream capacity costs. See

---

[7] We note also that the natural gas industry was unbundled in 1999, more than forty years after the enactment of § 94F, which has never been amended. St. 1953, c. 331. This would further suggest that marketers such as Energy Express were not the "customers" the Legislature had in mind.

Unbundling Order I at 12 ("Under mandatory assignment, [customers who purchase gas from marketers] will retain the responsibility for the costs associated with the capacity procured and maintained by the [LDC]"). Bay State must procure sufficient upstream capacity on behalf of both its sales and transportation customers. D.T.E. 04-1, at 53 (2005) ("Unbundling Order II"). Therefore, Bay State is the upstream capacity provider for its transportation customers. The upstream capacity is procured on the transportation customers' behalf, and the costs of that procurement are "inextricably linked" to Bay State's obligation to procure capacity for them. Unbundling Order I at 6. See Unbundling Order II at 53 (directing LDCs to "continue to plan for and procure upstream pipeline capacity" for both sales and transportation customers). As a practical administrative necessity to ensure an adequate and reliable supply of gas for its transportation customers, Bay State assigns the transportation customers' proportional share of upstream capacity to the marketers that sell gas to those transportation customers. See Unbundling Order I at 34-35 (adopting mandatory "slice-of-system" assignment of upstream capacity to marketers as necessity for reliability); Unbundling Order II at 52-53 (declining to deviate from mandatory capacity assignment adopted in Unbundling Order I).

That marketers such as Energy Express pay those costs up front does not alter the transportation customers' ultimate responsibility for their pro rata share of the capacity costs. Bay State also pays these costs up front. Yet, Bay State is not entitled to the refund, which demonstrates its customers' ultimate responsibility for the costs. See G. L. c. 164, § 94F. Energy Express is merely the assignee of Bay State with respect to the transportation customers' upstream capacity. See Unbundling order I at 34-35. Energy Express cannot independently purchase capacity from Bay State or the pipeline, nor does it provide capacity to customers. See Unbundling Order II at 26 (declining to open upstream capacity to private competition).

Rather, Energy Express acquires its own customers who remain dependent on Bay State to procure and provide upstream capacity. Bay State then adds together the total upstream capacity requirements of Energy Express's customers, obtains that capacity from a pipeline, and assigns it to Energy Express. Energy Express simply stands in Bay State's shoes. Thus, just as Bay State initially pays the upstream capacity costs to the pipeline on its sales customers' behalf, Energy Express does the same for its customers. It follows that Energy Express's contracts with its customers determine the extent to which it passes on these costs, in a manner parallel to how Bay State's

department-approved rates pass such costs on to its sales customers. See 220 Code Mass. Regs. § 14.03(4)(c), (d) (LDCs' rates established pursuant to regulatory requirements and codified in "tariff"). Regardless of such recovery, these customers are the parties responsible for the cost and thus the parties entitled to the refund. See G. L. c. 164, § 94F. See also Central States Elec. Co., 324 U.S. at 144.

Further, if an LDC's transportation customer switches marketers, or if a marketer leaves the market, the department has determined that the upstream capacity allotment and its associated costs must follow the transportation customer. See Unbundling Order I at 31. These costs do not become attached to the marketer who paid them on the transportation customer's behalf. Id. In other words, no matter who is selling natural gas to the customer, the customer requires -- and receives -- the same capacity, which is accompanied by the same costs.

For these reasons, it is reasonable for the department to attribute the final responsibility of upstream capacity costs to the transportation customers, while requiring the marketers to pay that cost initially.

Energy Express's argument that the department's interpretation unfairly enriches the customers also fails. Energy Express claims that giving its customers the refund results in those customers receiving a windfall. Yet, whether

the customers receive a windfall depends on the extent to which Energy Express passes on the costs of the upstream capacity that Bay State assigned Energy Express on behalf of that customer. As the department noted in its order, if Energy Express passed on the cost and received the refund, it would be Energy Express that received the windfall. This distribution of cost is set by Energy Express's private contract. We accept the department's determination that the terms of the private contract between Energy Express and its customers cannot absolve the customers of their ultimate responsibility for the upstream capacity costs.

2. The filed rate doctrine. The filed rate doctrine, as applicable in this case, requires that "interstate power rates filed with FERC or fixed by FERC must be given binding effect by [S]tate utility commissions determining intrastate rates." Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 962 (1986). As a result, Bay State submits to the department its "Distribution and Default Service Terms and Conditions" (referred to as a "tariff"), which includes the terms on which it may assign upstream capacity to marketers. Once the department approves the tariff, Bay State must comply with the provisions of the tariff. 220 Code Mass. Regs. § 14.03(2), (4)(c), (d). Charging a rate exceeding the limitations of the tariff would constitute a violation of the filed rate doctrine. See Nantahala Power & Light Co., supra.

Energy Express argues that giving the refund to its customers has the effect of requiring Energy Express to pay an amount for upstream capacity that exceeds Bay State's filed rate. To support its position, Energy Express points out that the tariff assigns the upstream capacity to marketers at the maximum FERC rate. The pipeline in this case charged a rate that FERC subsequently determined was too high. Energy Express paid that rate to the pipeline initially. Thus, Energy Express contends that if it does not receive the refund, it paid a rate exceeding what FERC allowed, which would then in turn violate the tariff. We disagree.

Energy Express's argument is again premised on a mischaracterization of the nature of the transaction. As noted above, Energy Express is not the party responsible for the upstream capacity costs -- its customers are. Energy Express merely paid the upstream capacity cost on behalf of its customers. Energy Express was able to decide how much of that cost to pass on to its customers. If Energy Express did not recover those costs, it elected not to do so pursuant to the freely negotiated terms of its private contracts with those customers. The department's mandatory "slice-of- system" assignment procedure did not obligate Energy Express to absorb those costs.

3. Department policy. Finally, Energy Express argues that the department's order is contrary to its own policy to allow the competitive market to lead to the efficient outcome. This court will not second guess the department's implementation of its own policy, in the absence of a legal justification for doing so, which the defendant has not provided. Bay State Gas Co., 459 Mass. at 813-814, citing G. L. c. 30A, § 14 (7). Moreover, the defendant's argument is internally flawed, as it once again hinges on the erroneous position that Energy Express's initial obligation to pay for the upstream capacity equates to an ultimate responsibility for those costs. As discussed above, although Energy Express pays the upstream capacity costs up front, it does so on behalf of its customers who, for valid regulatory reasons, bear the final responsibility for those costs.

Energy Express argues that the department interfered in the private market by ordering a refund to customers who freely negotiated the price they would pay to their marketers. Critically, however, Energy Express sells the gas commodity to its customers. It does not sell upstream capacity. Indeed, it cannot sell upstream capacity to these customers because upstream capacity has not been opened to private competition in Massachusetts. See Unbundling Order II at 26. Although Energy Express incurred the upfront costs for upstream capacity in

order to sell to these customers, it may pass these costs on to them as well. Energy Express is also free to decline to pass on the full cost to these customers. This option gives Energy Express a seemingly significant competitive advantage over Bay State, which is bound by its department-approved tariff. See 220 Code Mass. Regs. § 14.03(4)(c), (d). If, however, Energy Express chooses to retain some or all of those costs, that choice does not entitle Energy Express to a refund, which is intended to benefit the consumers to whom it sells natural gas. See G. L. c. 164, § 94F. See also Central States Elec. Co., 324 U.S. at 140. The extent to which marketers decide to assume part of their customer's upstream capacity costs, however, is precisely the type of determination best left to the competitive markets.[8]

Conclusion. The department reasonably interpreted "customer" as used in § 94F to include only those entities that consume the natural gas provided or transported by Bay State. This interpretation does not include Energy Express, which does not consume the gas. Therefore, § 94F does not entitle Energy

---

[8] To the extent the Maine Public Utilities Commission, in a decision cited by Energy Express, reached a different result based on Maine's distinct regulatory scheme, we accept the department's conclusion that the Maine decision is distinguishable. The mandatory slice-of- system assignment requirement utilized in the Commonwealth, which is a significant factor in attributing responsibility for upstream capacity costs to the consumer, is not the rule in Maine.

Express to a refund.  Energy Express's arguments that the filed rate doctrine entitles it to the refund and that the department has violated its own policy by providing the refund to transportation customers are similarly premised on a faulty characterization of Energy Express's role in the natural gas market.

<u>Order affirmed</u>.